[No. F019400. Fifth Dist. May 9, 1995.]

LILLIAN LOPEZ et al., Plaintiffs and Appellants, v.
TULARE JOINT UNION HIGH SCHOOL DISTRICT BOARD OF
TRUSTEES et al., Defendants and Respondents.

**COUNSEL**

Ann Brick, Alan Schlosser, Brobeck, Phleger & Harrison, Neil L. Shapiro, Stephen M. Knaster and Carrie M. McIntyre for Plaintiffs and Appellants.

Lita O'Neill Blatner, County Counsel, Gary de Malignon and Harold W. Wood, Jr., Deputy County Counsel, for Defendants and Respondents.

## OPINION

HARRIS, J.—The principal issue presented by this appeal is whether a school district is precluded by section 48907 of the Education Code[1] and article I, section 2 of the California Constitution, from requiring, on the ground of educational suitability, that a film arts class instructor have his students delete the profanity[2] in a student-produced film. We hold that school authorities may restrain such expression because it violates the "professional standards of English and journalism" provision of section 48907.

### FACTS

Lillian Lopez, Oscar Maldonado, Adriann McGrew and Sarah Valenzuela (plaintiffs or students) were students at Valley High School, a continuation school in the Tulare Joint Union High School District. During the 1991-1992 academic year, the students wrote and produced a film entitled "Melancholianne" in connection with a film arts class. The film, intended to address the problems of teenage pregnancy, essentially depicts a day in the life of the teenage parents, Christianne and Padron, and their baby, Melancholianne.

Christianne lives in a seedy, unkempt motel room with the six-month-old baby. Padron has just been released from prison after serving time for statutory rape of another girl. Christianne encounters Padron in a local park. She hits and kicks him and he replies, "I got a new woman; she can hit harder than you and she can fuck harder than you." Christianne, who wants to have a party that night, leaves the baby with Padron warning him, "don't fuck it up." Later when the baby begins to cry, one of Padron's friends taunts, "Lemme see you whip out your tit and nurse her." Padron spends the night with the baby at his mother's house. The film concludes with the young couple in mediation and then in court, making disparaging remarks about each other's parenting abilities. The judge rules the baby will be placed in foster care while both parents undergo counseling.

The film dialogue also includes the words "shit," "ass," "bitch," "son-of-a-bitch," "pimp" and the statement, "couldn't find twelve dudes in this county who ain't fucked the 'ho' [whore]."

---

[1] All further statutory references are to the Education Code unless otherwise indicated.

[2] By "profanity" we mean the specific vulgar or indecent language at issue.

The students believed the profanity made the film characters more realistic and convincing and stated in declarations that they hear such language in the "real world" every day. Eric Moberg, the film arts class instructor, thought "the sparse use of profanity in the script was appropriate and good." The school principal and the district superintendent, however, upon review of a draft of the script, found the language highly offensive and educationally unsuitable. They directed Moberg to have the students remove the profanity and reference to sexual activity from the script.

Moberg and the students appealed the administrator's directive to the school board. After public hearings, the board held that "sound educational policy" as well as district administrative regulation No. 5.3.1.3.1[3] required that the profanity in "Melancholianne" be deleted.

[3]Administrative regulation No. 5.3.1.3.1 provides in part:
"1. School Publications . . .
"Articles and graphics should reflect acceptable areas of student interest. Certain topics, which may stimulate dissent and controversy, should be presented in depth offering a variety of viewpoints. It is the intent of the Board that students be provided opportunities for instruction in research and publication of ideas, opinions and causes of interest to them.
"1.1 The value of school publications is exemplified best when students participate in activities through which they may inquire, question and exchange ideas within the context of the following purposes: "1.1.1 To provide instruction for teaching writing and other journalistic skills. 1.1.2 To provide an effective medium for the exchange of student opinions.
"1.1.3 To serve the entire student body by reporting school activities.
" . . . . . . . . . . . . . . . . . . . . . . . . .
"1.3 The teacher(s) . . . shall be responsible for the instruction and supervision of materials produced by students which will maintain:
"1.3.1 Professional standards of English grammar and journalistic writing style. "1.3.2 Verification of facts and quotes. 1.3.3 Space for rebuttals to editorials on controversial issues, . . . 1.3.4 Publication free from prohibited materials, which include:
"a. Material which is obscene according to current standards of this school community.
"b. Material which is libelous or violates a person's privacy rights.
"c. *Profanity, defined as language which would not be used in the Tulare Advance-Register or the Fresno Bee.*
"d. Material advocating the breaking of any law.
"e. Material critizing [*sic*] or demeaning any race, religion, sex or ethnic group.
"f. Advertisements for cigarettes, liquor or any other product not permitted teenagers.
"g. Material which would cause substantial disruption of school operation, defined as a threat of physical violence in the school or nearby community.
"1.4 Determination of appropriateness of written materials shall be the primary responsibility of the teacher(s) or adviser(s) who shall, with no prior restraint, review each article in accordance with the provisions of this policy. The school principal or designee may also review materials prior to publication when requested by the teacher/adviser. Censorship of materials, except for reasons specifically listed herein is prohibited. Nothing in this policy shall be construed to permit censoring any article because it is controversial or because it critizies [*sic*] a particular school, school procedure or the School District.
"In cases of disagreement as to whether an article should be printed, the decision of the principal or designee shall be final, subject to student appeal through regular channels of authority in the school and District." (Italics added.)

The school board made no finding on whether the profanity at issue was legally obscene, but rested its decision solely on the grounds of educational suitability. The board reasoned that, when the video is produced as part of a classroom activity, the video constitutes curriculum or "instructional material," notwithstanding student authorship. The board concluded section 48907 did not preclude its regulation of a student-authored script, when used for a classroom video project, which would be deemed educationally unsuitable if it had been prepared by someone other than the students. The school board authorized the school superintendent to take all necessary steps to carry out the purpose and intent of the resolution.

### PROCEDURAL HISTORY

The students, with the assistance of the American Civil Liberties Union, brought an action against the school district board of trustees and the school administrators (collectively the Board) for declaratory and injunctive relief challenging the authority of the Board to censor the videotape script.

Plaintiffs alleged, during the 1991-1992 school year, they were students at Valley High School, members of the Valley Film Arts Club and some were enrolled in the school's film arts class. During the preceding five school years, Valley High School students had written and produced videos which were shown to students and the public and were entered in off-campus film competitions. Plaintiffs, along with other students, wrote, produced and starred in the video "Melancholianne." Their teacher, Eric Moberg, approved the script. However, school principal Dan Neppel advised Moberg he would not allow the film to be released or shown unless the profanity, which he viewed as educationally unsuitable, was deleted. The Board upheld that decision and by resolution No. 92-12 concluded that sound educational policy required that the profanity in "Melancholianne" be deleted.

Plaintiffs alleged the Board's conduct (1) deprived them of their right of freedom of expression under article I, section 2 of the California Constitution (first cause of action); (2) violated section 48907 (second cause of action); (3) entitled them to a declaratory judgment that they had the right to complete and show "Melancholianne," and the Board had no right to censor or restrict release of the videotape (third cause of action); and (4) entitled them to a preliminary and permanent injunction prohibiting the Board from interfering with the completion and distribution of the film and otherwise seeking to chill the exercise of their constitutional and statutory rights, including taking any reprisal against plaintiffs or Moberg (fourth cause of action).

The court (Judge Conn) granted the students' request for a preliminary injunction on the ground that censorship of "Melancholianne" violated section 48907.

The Board then filed an answer to the students' first amended complaint denying many of the allegations in the complaint and raising a number of affirmative defenses.

Because there were no material facts in dispute, the parties filed cross motions for summary judgment. The court (Judge Sevier) granted the Board's motion for summary judgment and denied the students' motion. In ruling for the Board, the court found: (1) the students' free speech rights under section 48907 are no greater than those guaranteed by the United States Constitution; (2) while students have recognized free speech rights, school districts may limit certain types of speech under section 48907; (3) the Board may prohibit the words and phrases: "fuck," "shit," "bitch," "son-of-a-bitch," "ass," and "tit" in a student video production because they constitute "obscene expression" as a matter of law within the meaning of section 48907; and (4) those words and phrases may also be prohibited under that section because they constitute a per se violation of lawful school regulations.

## DISCUSSION

### Standard of Review

The issue before us, whether section 48907 authorizes the prior restaint at issue, is a question of law upon which we exercise our independent judgment. (*Wright* v. *City of Santa Clara* (1989) 213 Cal.App.3d 1503, 1505 [262 Cal.Rptr. 395].)

### Historical Development of Student Free Speech Rights

The First Amendment of the United States Constitution provides in part: "Congress shall make no law . . . abridging the freedom of speech . . . ." Article I, section 2, subdivision (a) of the California Constitution (hereafter, article I, section 2(a)) guarantees that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

The purpose of both the First Amendment and article I, section 2(a) was to abolish governmental censorship and to constitutionalize society's substantial interest in protecting the right to comment on issues of public concern. (Note, *Prior Restraint and the Public High School Student Press: The Validity of Administrative Censorship of Student Newspapers Under the Federal and California Constitutions* (1987) 20 Loyola L.A. L.Rev. 1055, 1068, hereafter

*Prior Restraint.*) Under a literal interpretation of either provision, legislators and school authorities may not exercise prior restraint over student publications. The courts, however, did not recognize any semblance of that construction for nearly half a century after they rejected prior restraints of the adult press. During this period, students did not have any recognized free speech and press rights. Instead, it was generally accepted that school officials stood in the stead of parents, i.e., in loco parentis, and had parent-like authority to control student conduct and expression. (*Prior Restraint, supra*, 20 Loyola L.A. L.Rev. at pp. 1070-1071.)

Judicial recognition of students' free speech rights came with the landmark United States Supreme Court ruling in *Tinker v. Des Moines School Dist.* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733]. The *Tinker* court recognized that school officials generally had comprehensive authority to prescribe and control conduct in the schools, but this authority did not extend to administrative censorship of public school students' nondisruptive expression. Students did not "shed their constitutional rights to freedom of speech or expression at the school house gate." Thus, although students' First Amendment rights had to be "applied in light of the special characteristics of the school environment," students could not be "confined to the expression of those sentiments that are officially approved." (*Id.* at pp. 506, 511 [21 L.Ed.2d at pp. 737, 740].)

The court declared that students may exercise their rights to freedom of expression unless the "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others . . . ." (*Tinker v. Des Moines School Dist., supra*, 393 U.S. at p. 513 [21 L.Ed.2d at p. 741].)

Prior to *Tinker*, California public school students' publications were governed by sections 9012 and 9013. Those statutes banned "partisan" or "propaganda" publications on campuses. (*Prior Restraint, supra*, 20 Loyola L.A. L.Rev. at p. 1079.) In Rowe v. Campbell Union High School Dist. (U.S. Dist. Ct., N.D. Cal., 1970, No. 51060) the Northern California federal district court found sections 9012 and 9013 unconstitutional. (*Prior Restraint, supra*, 20 Loyola L.A. L.Rev. at p. 1080.) Relying on *Tinker*, the court concluded that sections 9012 and 9013 were impermissibly overbroad since they prohibited expression whether or not it disrupted legitimate educational activities. The court noted that while immaturity is a valid reason for certain specific, well-defined limitations on high school students' rights, it did not justify the comprehensive restrictions of sections 9012 and 9013. (*Prior Restraint, supra*, 20 Loyola L.A. L.Rev. at pp. 1081, 1082.)

The Rowe court indicated that although the Supreme Court viewed prior restraints with disfavor, ". . . a system of prior review may be constitutionally permissible in the secondary school setting." The court suggested "a

simple prohibition against the distribution of certain categories of material." (*Prior Restraint, supra,* 20 Loyola L.A. L.Rev. at pp. 1084-1085.) Such a straightforward system would allow the unfettered distribution of student publications except where the content of the material is outside the protections of the First Amendment, i.e., obscenity, criminal libel, advocacy of law-breaking or inciting to violence. (*Id.* at p. 1086 & fn. 106.) The court further suggested that in situations where the content is unobjectionable but there is an infraction of reasonable regulations controlling the manner of distribution, the student could be disciplined in the same manner as for infractions of any school regulation. (*Id.* at p. 1086.)

In the wake of *Tinker* and Rowe, the California Legislature repealed sections 9012 and 9013 and enacted section 10611. In doing so, the Legislature effectuated the nation's first statutory scheme for protecting students' free expression on school campuses. (*Prior Restraint, supra,* 20 Loyola L.A. L.Rev. at p. 1059.)

Section 10611 provided:

"Students of the public schools have the right to exercise free expression including, but not limited to, the use of bulletin boards, the distribution of printed materials or petitions, and the wearing of buttons, badges, and other insignia, except that expression which is obscene, libelous, or slanderous according to current legal standards, or which so incites students as to create a clear and present danger of the commission of unlawful acts on school premises or the violation of lawful school regulations, or the substantial disruption of the orderly operation of the school, shall be prohibited.

"Each governing board of a school district and each county superintendent of schools shall adopt rules and regulations relating to the exercise of free expression by students upon the premises of each school within their respective jurisdictions, which shall include reasonable provisions for the time, place, and manner of conducting such activities." (*Bright* v. *Los Angeles Unified Sch. Dist.* (1976) 18 Cal.3d 450, 452, fn. 1 [134 Cal.Rptr. 639, 556 P.2d 1090].)

Section 10611 enhanced the protection of student expression in general but quickly became controversial because it contained no specific reference to official student newspapers. In response to the controversy, the California Legislative Counsel issued an opinion in 1974 concluding that section 10611 protected student expression in official student newspapers. The Legislative Counsel determined that school administrators could not exclude material from school publications unless it was obscene, libelous or would substantially disrupt school activities. (*Prior Restraint, supra,* 20 Loyola L.A. L.Rev. at pp. 1089-1090.)

Many school district lawyers, however, disagreed with the Legislative Counsel's opinion and maintained a policy of granting school principals broad power to censor student publications. This controversy eventually reached the California Supreme Court in *Bright* v. *Los Angeles Unified Sch. Dist., supra,* 18 Cal.3d 450. There, the plaintiff challenged school district regulations, promulgated pursuant to section 10611, relating to the circulation of student underground newspapers. One of the challenged regulations required approval of the proposed publication by the principal before its distribution on campus. The court held the regulation violated the rights established by section 10611 and was void. While prior restraint of student expression might be constitutionally permissible in the high school setting, the statute did not authorize it. Section 10611 permitted school authorities to stop distribution of offensive material and discipline those responsible; but it did not authorize them to prevent the distribution in the first place through administrative censorship or prior restraint of its content. (18 Cal.3d at p. 464.)

*Bright* was not considered an absolute triumph for student press freedom, however. First, it involved an unofficial newspaper rather than an official student newspaper. Second, it did not prohibit censorship outright. *Bright* invalidated the school's prior restraint system because section 10611 did not authorize prior restraints. However, the court indicated, its decision did not preclude the Legislature from establishing a system of prior restraint in the school environment. (*Bright* v. *Los Angeles Unified Sch. Dist., supra,* 18 Cal.3d at p. 464.)

Recognizing the remaining potential for administrative censorship of official student publications, journalism teachers in California lobbied for an amendment to section 10611 which would specifically include official school publications. Within a month of the *Bright* decision, legislation was introduced in the Senate to accommodate those concerns. (*Prior Restraint, supra,* 20 Loyola L.A. L.Rev. at p. 1096.) After several unsuccessful attempts to amend section 10611, the Legislature eventually passed legislation in 1978 that became section 48907. Section 48907 specifically protected student expression in official school publications, but it also expressly provided for a limited form of censorship in "official school publications."

Section 48907 provides:

"Students of the public schools shall have the right to exercise freedom of speech and of the press including, but not limited to, the use of bulletin boards, the distribution of printed materials or petitions, the wearing of buttons, badges, and other insignia, and the right of expression in official

publications, whether or not such publications or other means of expression are supported financially by the school or by use of school facilities, *except that expression shall be prohibited which is obscene, libelous, or slanderous. Also prohibited shall be material which so incites students as to create a clear and present danger of the commission of unlawful acts on school premises or the violation of lawful school regulations,* or the substantial disruption of the orderly operation of the school.

"Each governing board of a school district and each county board of education shall adopt rules and regulations in the form of a written publications code, which shall include reasonable provisions for the time, place, and manner of conducting such activities within its respective jurisdiction.

"Student editors of official school publications shall be responsible for assigning and editing the news, editorial, and feature content of their publications subject to the limitations of this section. However, it shall be the responsibility of a journalism adviser or advisers of student publications within each school to supervise the production of the student staff, to maintain professional standards of English and journalism, and to maintain the provisions of this section.

*"There shall be no prior restraint of material prepared for official school publications except insofar as it violates this section.* School officials shall have the burden of showing justification without undue delay prior to any limitation of student expression under this section.

" 'Official school publications' refers to material produced by students in the journalism, newspaper, yearbook, or writing classes and distributed to the student body either free or for a fee.

"Nothing in this section shall prohibit or prevent any governing board of a school district from adopting otherwise valid rules and regulations relating to oral communication by students upon the premises of each school." (Italics added.)

Eight years after the California Legislature enacted section 48907, the United States Supreme Court held that the First Amendment did not prevent a school district from disciplining a high school student who gave a lewd speech at a school assembly. (*Bethel School Dist. No. 403* v. *Fraser* (1986) 478 U.S. 675, 685 [92 L.Ed.2d 549, 559-560, 106 S.Ct. 3159] (*Bethel*).) In *Bethel*, a high school student gave a nominating speech during a school assembly as part of a school-sponsored program in self-government. The student referred to his candidate "in terms of an elaborate, graphic, and

explicit sexual metaphor." (*Bethel, supra,* 478 U.S. at pp. 677-678 [92 L.Ed.2d at pp. 554-555].) The student was disciplined for violating a school's rule which prohibited the use of obscene and profane language. (*Id.* at p. 678 [92 L.Ed.2d at p. 555].) The Supreme Court held the sanctions did not violate the student's First Amendment rights.

Under the First Amendment, adults, making what the speaker considers a political point, cannot be prohibited from using an offensive form of expression. But the same latitude need not be permitted to children in a public school. (*Bethel, supra,* 478 U.S. at p. 682 [92 L.Ed.2d at pp. 557-558].) The freedom to advocate unpopular and controversial views must be balanced against "the society's countervailing interest in teaching students the boundaries of socially appropriate behavior." (*Id.* at p. 681 [92 L.Ed.2d at pp. 557].) Further, the determination of what manner of speech in a classroom or school assembly is inappropriate properly rests with the school board. (*Id.* at p. 683 [92 L.Ed.2d at p. 558].)

In a similar vein, in *Hazelwood School District* v. *Kuhlmeier* (1988) 484 U.S. 260 [98 L.Ed.2d 592, 108 S.Ct. 562] (*Kuhlmeier*), the court upheld a school principal's authority to delete articles describing students' experiences with pregnancy and the impact of divorce on students from the school newspaper which was written and edited by the journalism class. The court held the newspaper was not a public forum. School facilities may be deemed public forums only if school authorities have by policy or practice opened those facilities for indiscriminate use by the general public or some segment of it. Here, the authorities reserved the forum for its intended purpose—a supervised learning experience for journalism students. Thus, they were entitled to regulate the contents of the newspaper in any reasonable manner. (*Id.* at p. 270 [92 L.Ed.2d at pp. 604-605].)

"The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." (*Kuhlmeier, supra,* 484 U.S. pp. 270-271 [98 L.Ed.2d at p. 605].)

The court concluded that educators are entitled to exercise greater control over the second form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school. (484 U.S. at p. 271 [98 L.Ed.2d at pp. 605-606].) A school may in its capacity as publisher of a school newspaper or producer of a school play " 'disassociate itself' " from speech that would substantially interfere with its work or impinge upon the rights of other students, or from speech that is ungrammatical, poorly written, biased, *vulgar or profane*, or unsuitable for immature audiences. (*Ibid.*) Accordingly, ". . . educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." (*Kuhlmeier, supra*, 484 U.S. at p. 273 [98 L.Ed.2d at p. 606].)

Within a month of the *Kuhlmeier* decision, the Fourth District Court of Appeal considered a challenge to the constitutionality of section 48907 under article I, section 2(a) of the California Constitution. In *Leeb* v. *DeLong* (1988) 198 Cal.App.3d 47 [243 Cal.Rptr. 494], the student editor of a public high school newspaper sought an injunction against the school principal and others with respect to their prohibition of the distribution of an issue of the newspaper they deemed contained a possibly defamatory article. Leeb claimed that section 48907 on its face and the school district's administrative regulation adopted pursuant to that statute—both of which provided for prior restraints with respect to official school publications in certain limited circumstances—violated the free press provision of the California Constitution. (198 Cal.App.3d at p. 51.) Summary judgment for the school district was affirmed.

The court noted, if *Kuhlmeier* were applicable in California, the answer would be clear, but it is not: "Section 48907 of the Education Code and California decisional authority confer editorial control of official student publications on the student editors alone, with very limited exceptions. The broad power to censor expression in school sponsored publications for pedagogical purposes recognized in *Kuhlmeier* is not available to this state's educators." (198 Cal.App.3d at p. 54, fn. omitted.)

The *Leeb* court reasoned, in *Bailey* v. *Loggins* (1982) 32 Cal.3d 907 [187 Cal.Rptr. 575, 654 P.2d 758], the Supreme Court rejected the contention that the state as publisher enjoys the same total control over the content of a newspaper as a private publisher. *Bailey* held that the state, having established an activity which has the elements of free expression, must consider

the First Amendment in restricting that expression. The dissent in *Bailey* took essentially the same position as the United States Supreme Court in *Kuhlmeier*. Nevertheless, the *Leeb* court felt compelled to follow the views of the majority in *Bailey*. (*Leeb* v. *DeLong, supra,* 198 Cal.App.3d at pp. 55-56.)

The court then considered the constitutionality of section 48907's prior restraints given that, "[a]t least by statute a school newspaper is a limited forum in this state." (*Leeb* v. *DeLong, supra,* 198 Cal.App.3d at p. 57.) The court concluded section 48907 does not offend the California Constitution.

"A school district in this state may censor expression from official school publications which it reasonably believes to contain an actionable defamation, but not as a matter of taste or pedagogy. [Citations.] Grading or postpublication discipline, if warranted, is adequate to achieve the latter ends." (198 Cal.App.3d at p. 60, fn. omitted.)

Finally, the 1992 Legislature added section 48950, protecting the rights of public high school students to engage in constitutionally protected speech or other communication. The legislative intent was " 'that a student shall have the same right to exercise his or her right to free speech on campus as he or she enjoys when off campus.' " (See Historical and Statutory Notes, 27B West's Ann. Ed. Code (1993 ed.) § 48950, p. 602, quoting Stats. 1992, ch. 1363, § 4, subd. (b).) The section provides that school districts are prohibited from making or enforcing "any rule subjecting any high school pupil to disciplinary sanctions solely on the basis of conduct that is speech or other communication" that, if engaged in off campus, is protected from government restriction by the First Amendment or by article I, section 2(a) of the California Constitution. But "free speech rights are subject to reasonable time, place, and manner regulations." (§ 48950, subds. (a), (f).) And, nothing in section 48950 may be construed to supersede, limit or modify the provisions of section 48907. (§ 48950, subd. (e).)

Against this historical backdrop, we must determine: (1) whether section 48907 authorizes the Board to ban profane expression from "Melancholianne" and (2) if so, whether such censorship violates article I, section 2(a) of the California Constitution.

*Contentions of the Parties*

The students contend section 48907 precludes the Board from censoring "Melancholianne" because: (1) it prevents prior restraint in official school publications unless the expression banned is obscene, libelous or slanderous

or so incites students as to cause a clear and present danger of unlawful or disruptive behavior; (2) the prohibited expression is not "obscene" within the meaning of the statute; and, (3) such language does not so incite "students as to create a clear and present danger of the commission of . . . the violation of lawful school regulations, or the substantial disruption of the orderly operation of the school" within the meaning of section 48907.

The Board contends section 48907 authorizes it to direct the film class instructor to require the students to remove the profanity from their script because: (1) student speech rights protected by section 48907 are only coextensive with those protected by the First Amendment where, as here, the speech involves school curriculum; (2) the students' free speech rights under section 48907 must be construed in light of other state statutes and regulations which require schools to teach students to avoid profanity and which require students to refrain from using vulgar or profane language; (3) the challenged language is "obscene" within the meaning of section 48907; and (4) the language is censorable because it violates a lawful school regulation.

1. *Section 48907 does not preclude the Board from deleting the profanity from the student video.*

(a) *Section 48907 provides greater free speech protection than does the United States Constitution.*

In granting summary judgment for the Board, the trial court found the students' rights to freedom of speech and the press recognized by section 48907 are consistent with, and no greater than, those guaranteed by the United States Constitution as interpreted by the United States Supreme Court. Case law holds to the contrary. (*Leeb* v. *DeLong*, *supra*, 198 Cal.App.3d at p. 54.)

On appeal, the Board argues the Legislature intended that the free speech rights protected by section 48907 be no broader than those protected by the United States Constitution. The Board relies on 1971 legislative material from Senator Albert S. Rodda, the Senate sponsor of Senate Bill No. 890, which became section 10611, which in turn became section 48907. Senator Rodda confirmed that the purpose of Senate Bill No. 890 was to provide clarifying legislation in light of the *Rowe* decision.

"The language of SB 890 was written in cooperation with members of the Attorney General's Office, and staff from the County Counsel of those counties where the court decision was rendered in order to insure that the bill conformed strictly to the court mandate. . . .

" 'We also believe the proposed bill is a correct statement of constitutional law as interpreted by the courts, and as worded would be upheld on court

review. Adoption of the bill would not enlarge upon the rights of students and failure to adopt the bill would not diminish their rights. However, adoption of the bill should help to clarify the present status of student rights.' "

The Board urges that this language compels the court to interpret section 48907 to provide no greater free speech protection for students in public schools than that provided by the federal Constitution. We glean no such legislative intent. The only reasonable interpretation of Senator Rodda's comments is that section 10611 constitutes a statutory embodiment of the *Tinker* and related First Amendment cases at that time. It neither expanded nor diminished student rights because it merely reiterated controlling case law. The statutory language cannot reasonably be construed to indicate any legislative intent that the rights protected by the statute would expand or contract according to subsequent developments in federal law.

Moreover, the California Supreme Court has taken a different approach than the United States Supreme Court when analyzing the government's ability to regulate the content of its own sponsored publications. The Kuhlmeier, *supra*, 484 U.S. 260 holding is based on the premise that school-sponsored publications, theatrical productions and other expressive activities that students, parents and members of the public might reasonably perceive to bear the imprimatur of the school are not public forums for free speech purposes but are simply "curriculum" designed to impart particular knowledge or skills to the student participants. Thus, educators are entitled to exercise greater control over these types of activities to assure the participants learn the lessons the activity is designed to teach. (*Id.* at pp. 270-271 [98 L.Ed.2d at pp. 604-606].)

The California Supreme Court rejected an analogous argument in a prison newspaper case and concluded that the newspaper at issue was a limited public forum rather than mere curriculum. In *Bailey* v. *Loggins, supra,* 32 Cal.3d 907, the inmate editor of a prison newspaper sought a peremptory writ mandating the Department of Corrections to publish two articles speaking favorably of collective bargaining by prisoners, and for narrower regulations governing newspaper content. In a plurality opinion, the court examined the question of the power of the department to censor items in an inmate newspaper edited and published at the state prison and financed by the inmate welfare fund. The lead opinion by two justices concluded: "The department regulations and practices evidence an intention to allow publication of a prison newspaper which serves several purposes: aiding the education and morale of the prisoners; providing information from the administration and on events within the institution; and providing a limited forum in

which prisoners can express their views and opinions on matters affecting them. Consequently, although the department retains greater powers to regulate and censor than would be appropriate outside the prison walls, it does not have total or arbitrary power, but must exercise its authority even-handedly and with sensitivity to the values protected by the First Amendment and corresponding California constitutional and statutory provisions." (32 Cal.3d at pp. 921-922.)

Based on its view that the prison newspaper provided a limited public forum, the court concluded the department could censor newspapers in order to provide for the reasonable security of the institution and the protection of the public and to serve valid penological objectives. (*Bailey* v. *Loggins*, *supra*, 32 Cal.3d at p. 920.)

Justices Richardson, Mosk and Kaus dissented because they disagreed with the premise that a prison newspaper was a "public forum" which bestowed on its users constitutional free speech protections. (*Bailey* v. *Loggins*, *supra*, 32 Cal.3d at pp. 924, 928-929, dis. opn. of Richardson, J., joined by Mosk, J.; dis. opn. of Kaus, J.) These justices viewed the inmate newspaper as educational and vocational training organs rather than a forum for the expression of ideas.

"[The prison newspaper regulations] permit an intramural, educational training exercise, designed primarily to aid in the inmates' rehabilitation—a pedagogical effort to which the First Amendment is as relevant as the Clayton Act to a game of Monopoly." (32 Cal.3d at p. 930, dis. opn. of Kaus, J.)

The dissenters' view was not adopted by the majority in *Bailey*, however, as it essentially was by the United States Supreme Court in *Kuhlmeier*. Instead, the *Bailey* majority found the newspaper was a limited forum for free speech purposes and, therefore, was subject to constitutional protections. (*Leeb* v. *DeLong*, *supra*, 198 Cal.App.3d at pp. 55-56.)

Thus, neither the legislative history of section 48907 nor California case law supports the conclusion that a student's free speech rights under section 48907 are only coextensive with those guaranteed by the First Amendment and federal case law.

*McCarthy* v. *Fletcher* (1989) 207 Cal.App.3d 130 [254 Cal.Rptr. 714], is consistent with that conclusion. In *McCarthy*, this court considered a First Amendment challenge to the school board's authority to exclude books from the school curriculum. We held, although a school board did not have an

absolute power to determine school curriculum, it had broad authority to establish and apply its curriculum in such a way as to transmit community values, including traditional social, moral or political values. Thus, school boards could properly remove or restrict the use of books and other instructional materials that were pervasively vulgar, profane, or contrary to prevailing moral standards. (*McCarthy* v. *Fletcher*, *supra*, 207 Cal.App.3d at p. 144.)

The *McCarthy* court acknowledged the *Leeb* court's statement that the broad power to censor expression in school-sponsored publications for pedagogical purposes recognized in *Kuhlmeier* was not available to California educators. The court explained, however, the difference was not due to the California school authorities having less discretion with respect to curriculum decisions in general. Rather, the discrepancy was caused by "the constraints placed on school officials with respect to student-produced publications by . . . section 48907." (*McCarthy* v. *Fletcher*, *supra*, 207 Cal.App.3d at p. 146, fn. 3.) Thus, federal authority is not dispositive of this case because of the special protections set forth in section 48907.

The concurring opinion of Presiding Justice Ardaiz reaches the same destination we do, but by a very different legal route. We respectfully disagree with the analysis on one point which deserves further discussion. Specifically, we disagree with the conclusion that school authorities may censor (i.e., exercise prior restraint over) student expression which is not prepared for an official school publication.[4] As we explain, our reading of the legislative history of section 48907 and binding case law points to the opposite conclusion.

In *Bright* v. *Los Angeles Unified Sch. Dist.*, *supra*, 18 Cal.3d 450, the Supreme Court clearly and expressly held that the statute then in effect, former section 10611, did not authorize any prior restraint of student expression, even when the expression fell within a category (libel) which the

---

[4]We also note that neither party asserted, either in the trial court or on appeal, that the video was not an official school publication for purposes of applying section 48907. Both below and in this court the student-plaintiffs conceded the video was an official school publication. While not expressly addressing the question, the Board did argue below that "the same rules pertaining to vulgarity and profanity apply to a work of fiction like a 'school play' or a video as it does [*sic*] to a school newspaper." It did not argue to the contrary in this court.

Because the parties have not raised or briefed the issue of whether the video is an official school publication, we see no need to decide it. We simply note that we do not readily see any policy reason for distinguishing between student expression in school-sponsored activities solely on the basis of the medium by which the expression is conveyed. For example, if "Melancholianne" had been prepared as a short story for inclusion in the school newspaper, it clearly would have been subject to the limitations on prior restraint expressed in section 48907. Why should different standards apply simply because it was prepared in video rather than written form?

statute provided "shall be prohibited." (18 Cal.3d at pp. 462-464.) The statute (then renumbered as § 48916) was amended at the next legislative session. (See Stats. 1977, ch. 776, § 1.) The amendments germane to this case can be categorized as follows:

(1) The first paragraph was divided into two sentences. Some language was added to include "the right of expression in official publications" within the statute's protective sweep.[5] Other language in the first paragraph was either deleted or revised, but, in our opinion, there was no significant change in the paragraph's import. Significantly, the paragraph does not refer to any right of prior restraint, even as to those categories of expression which "shall be prohibited."

(2) Four new paragraphs were added dealing with school publications. The first two provide for adoption of a publications code and faculty oversight responsibility "to maintain professional standards of English and journalism, and to maintain the provisions of this section." The third states that "[t]here shall be no prior restraint of material prepared for official school publications except insofar as it violates this section. . . ." The fourth is definitional.

Thus, as the new statute now stands, its first paragraph is substantially similar to that which the Supreme Court interpreted in *Bright* as not providing for any prior restraint. The only reference to prior restraint in the statute is limited to official school publications. Nevertheless, the concurring opinion apparently assumes that under section 48907 school authorities can now censor all forms of student expression whether or not prepared for an official school publication. We do not understand how we can ignore the plain holding in *Bright*, nor do we know of any rule of statutory interpretation which supports the concurring opinion's reading of the amended statute.

The only reported decision construing section 48907 apparently agrees with our analysis, albeit in dictum. In *Leeb* v. *DeLong*, *supra*, 198 Cal.App.3d 47, the Fourth District Court of Appeal, Division Three, stated that "[i]f a school district might be able to constitutionally ban privately produced student publications (*which it cannot under Education Code section 48907*), it surely ought to be able to impose prior restraints on its own official student productions in certain circumstances." (198 Cal.App.3d at p. 57, fn. 6, italics added.) We take this comment to mean that the *Leeb* court

[5]Former section 10611 did not refer to official school publications. Inclusion of those publications in the amended statute was apparently a response to efforts by journalism teachers who feared that unless those publications were included, they might be subject to administrative censorship without statutory limitations. (See *Prior Restraint, supra,* 20 Loyola L.A. Law Rev. at p. 1096.)

construes section 48907 as not permitting prior restraint of student expression unless it appears in an official school publication.

We fully agree with the concurring opinion that the Board could constitutionally prohibit the use of the language contained in "Melancholianne." Our difference, however, is in finding the statutory grant of authority under which the Board acted. We believe the power of prior restraint is found only in section 48907 and only as to official school publications.

(b) *Whether or not the profanity in "Melancholianne" is an "obscene" expression within the meaning of section 48907, the Board may direct the teacher and students to delete it because it violates the section's mandate to maintain "professional standards of English and journalism."*

The Board, in determining that the profanity in "Melancholianne" should be deleted, made no finding as to whether the language was legally obscene, but based its decision on the grounds the language was educationally unsuitable in a classroom project. The trial court, however, concluded the profane language constituted "obscene expression" as a matter of law within the meaning of the section 48907. In so concluding, the court found that "[n]either the Penal Code definition nor the standards of *Roth* v. *United States* (1957) 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304] and *Miller* v. *California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607], apply to the term 'obscene.' "

We need not decide whether the Legislature intended to include the profanity at issue within the term "obscene expression." Legislative history demonstrates the Legislature intended to preclude the students' use of "four letter words" under the auspices of the "professional standards of English and journalism" provision.

The students contend the censored language in "Melancholianne" is not obscene under the legal definition of the term and the court erred in failing to apply this definition when interpreting section 48907. The Board agrees the prohibited language is not obscene under the legal definition.

*Statutory Construction*

Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so that we effectuate the purpose of the law. In determining legislative intent, we look first to the words of the statute themselves, giving to the language its usual, ordinary meaning. The language must be construed in context and provisions relating to the same

subject matter must be harmonized to the extent possible. If the meaning is without ambiguity or uncertainty, then the language controls and there is nothing to interpret or construe. However, if the meaning is not clear, we consider the legislative history of the statute and the historical circumstances of its enactment in ascertaining the legislative intent. Finally, if the first two steps fail to reveal clear meaning, we apply reason, practicality and common sense to the language. If possible the words should be interpreted to make them workable and reasonable, in accord with common sense and justice, and avoid an unjust or absurd result. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323]; *Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238-39 [8 Cal.Rptr.2d 298].)

*"[P]rofessional standards of English and journalism" Provision.*

Section 48907 provides in part:

"Each governing board of a school district and each county board of education shall adopt rules and regulations in the form of a written publications code, which shall include reasonable provisions for the time, place, and manner of conducting such activities within its respective jurisdiction.

"Student editors of official school publications shall be responsible for . . . content of their publications subject to the limitations of this section. However, *it shall be the responsibility of a journalism adviser or advisers of student publications within each school . . . to maintain professional standards of English and journalism*, and to maintain the provisions of this section.

"There shall be no prior restraint of material prepared for official school publications *except insofar as it violates this section.*" (Italics added.)

The words of the statute themselves evince a legislative purpose to permit prior restraint of material prepared for official school publications when the material "violates" the statute. Further, the legislative history of section 48907 indicates the Legislature did not intend to protect student expression which constituted profanity.

Within a month of the *Bright* decision, Assembly Bill No. 207 was introduced to amend section 10611 to specifically include official student newspapers within the ambit of its protection. The bill breezed through the Assembly but was defeated on the Senate floor after a senator charged that the bill would open the door for students to proliferate four-letter words in

their newspapers. (*Prior Restraint, supra*, 20 Loyola L.A. L.Rev. at pp. 1096-1097, fn. 206.) A year later, the Los Angeles Journalism Teachers Association, a sponsor of the legislation,[6] prevailed upon Senator Dills to introduce Senate Bill No. 357, which became section 48907. (20 Loyola L.A. L.Rev. at p. 1097, fn. 207.)

The association represented that Senate Bill No. 357 would not allow four-letter words in student newspapers because it permitted the journalism teacher to " 'maintain professional standards of English and journalism,' thereby allowing the teacher to prohibit the use of four-letter words, which obviously do not meet 'professional standards' set by . . . respected publications."

The deputy executive director of United Teachers-Los Angeles wrote the members of the Senate expressing the teachers' support for the bill. He stated, "SB 357 differs from AB 207, which was before the Senate two years ago, inasmuch as it gives the Journalism advisors within each school the responsibility of supervising the productions of the student staff to maintain professional standards of English and Journalism.

"The inclusion of this new language would allow the Journalism teacher to prohibit the use of four-letter words, which obviously do not meet professional standards. The Los Angeles Times and other quality newspapers do not use four-letter words and this bill would allow the teacher/advisor to maintain professional standards as is done in our public newspapers.

"In January of 1977, the Los Angeles School System adopted guidelines for official student newspapers that would conform to SB 357. These guidelines have worked without any problems since that time. . . .

"It is felt that SB 357 is a bill that is designed to allow students some additional freedom in editing official school newspapers, while at the same time recognizing good journalistic techniques and giving the publications advisors responsibility in maintaining a quality newspaper."

The Los Angeles School District guidelines attached to the letter provide in part: "MATERIAL NOT PERMITTED IN SCHOOL NEWSPAPERS: (1) Material which is libelous or which violates the right of privacy; (2) Material which is obscene, according to current standards of the community; (3) *Profanity,*

---

[6] Statements of the sponsor of legislation are entitled to be considered in determining the import of the legislation. (*Kern* v. *County of Imperial* (1990) 226 Cal.App.3d 391, 401 [276 Cal.Rptr. 524].)

*hereby defined as that language which would not be used in the L.A. Times or the L.A. Herald-Examiner;* (4) Material which advocates the breaking of any law . . . ." (Italics added.) The legislative materials indicate the Legislature intended to prohibit "four-letter-words" in official school publications by a grant of authority to the journalism teacher to require the students to "maintain professional standards of English and journalism." The question left unanswered is whether section 48907 authorizes the Board to restrain publication of the unprofessional language when the teacher fails to carry out his or her responsibilities under the statute.

Legal precedent bodes in favor of prior restraint of profane words in official school publications. Traditionally, profane words have been accorded less constitutional protection than other types of speech.

■ "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words . . . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (*Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568, 571-572 [86 L.Ed. 1031, 1035, 62 S.Ct. 766], fns. omitted; accord, *FCC* v. *Pacifica Foundation* (1978) 438 U.S. 726, 746 [57 L.Ed.2d 1073, 1091-1092, 98 S.Ct. 3026]; *Lee* v. *Superior Court* (1992) 9 Cal.App.4th 510, 517 [11 Cal.Rptr.2d 763].)

This reasoning is particularly apropos when the expression is aimed at minors rather than adults. (See *FCC* v. *Pacifica Foundation, supra*, 438 U.S. at p. 749 [57 L.Ed.2d at pp. 1093-1094]; *Ginsberg* v. *New York* (1968) 390 U.S. 629, 638-640 [20 L.Ed.2d 195, 203-204, 88 S.Ct. 1274].) ■ Here, plaintiffs' intended audience was primarily high school teenagers. The school authorities had a substantial interest in protecting the student audience from expression which could be embarrassing or detrimental to their stage of development. (*Bethel, supra*, 478 U.S. at pp. 682-683 [92 L.Ed.2d at pp. 557-558].) Given the special nature of the high school environment, school authorities have a right and a duty to restrain profanity in official school publications and thereby maintain "professional standards of English and journalism."

Censorship of "four-letter words" does not unduly hinder the students' ability to express their ideas or opinions on any subject. It enjoins only the indecent manner in which an idea is expressed.

"A requirement that indecent language be avoided will have its primary effect on the form, rather than the content, of serious communication. There are few, if any, thoughts that cannot be expressed by the use of less offensive language." (*FCC* v. *Pacifica Foundation, supra*, 438 U.S. at p. 743, fn. 18 [57 L.Ed.2d at p. 1089].)

The students argue the language restriction renders "Melancholianne" less effective in conveying their ideas because the film characters are more convincing and persuasive when they use profanity. However, the counter argument is that a ban on profanity makes the film more acceptable to a wider audience, who may benefit thereby from the ideas expressed in the film. Further, because the film is an official school publication, it reflects on the school and the student body as a whole. The Board and other members of the student body have an interest in not being associated with the profane language utilized in the film.

Authorizing censorship of materials that fail to meet "professional standards of English and journalism" within the meaning of the statute does not create an impossibly loose standard when viewed in context. Section 48907 requires each school district governing board to adopt a written publications code which includes reasonable time, place and manner regulations of student publication activities. To this end, the Board adopted administrative regulation No. 5.3.1.3.1 (see fn. 3, *ante*) which defines the teacher's role in maintaining professional standards. The pertinent subdivisions provide:

"1.3 The teacher(s) . . . shall be responsible for the instruction and supervision of materials produced by students which will maintain:

"1.3.1 Professional standards of English grammar and journalistic writing style.

". . . . . . . . . . . . . . . . . . . . . . .

"1.3.4 Publication free from prohibited materials, which include:

". . . . . . . . . . . . . . . . . . . . . . .

"c. Profanity, defined as language which would not be used in the Tulare Advance-Register or the Fresno Bee. . . ."

Students and teachers unsure of whether particular language is prohibited need only check the district's publication code and the referenced local publication(s) for the limits of their literary or artistic license.

Moreover, even if we accept plaintiffs' premise that profanity in films is de rigueur, we need not accept their conclusion that the California Constitution and section 48907 therefore require the Board to condone profane

speech just because it is uttered in a student-produced film which constitutes an "official school publication." The regulation prohibiting profanity in official school publications is a reasonable "manner" regulation on high school student speech within the meaning of section 48907.

Having concluded that section 48907 permits prior restraint of profane student expression in official student publications which "violates [the] section" by failing to adhere to "professional standards of English and journalism," we must consider whether such restraint is constitutional under the federal and state Constitutions.

(c) *Prior restraint of the profanity is permitted under the First Amendment.*

The question is easily answered under the First Amendment. *Kuhlmeier* held, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." (*Kuhlmeier, supra*, 484 U.S. at p. 273 [98 L.Ed.2d at p. 606].) Teaching students to avoid vulgar and profane language is obviously a legitimate pedagogical concern. Therefore, the Board's prior restraint was proper under the First Amendment.

(d) *Prior restraint of the profanity is permitted under the California Constitution.*

The answer is the same under the California Constitution. ■ Article I, section 2(a) does not mirror the First Amendment either in form or content. (*U.C. Nuclear Weapons Labs Conversion Project* v. *Lawrence Livermore Laboratory* (1984) 154 Cal.App.3d 1157, 1163 [201 Cal.Rptr. 837].) Courts have construed its free speech provisions as more protective, definitive and inclusive of rights to expression of speech than their federal counterparts. (*Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908 [153 Cal.Rptr. 854, 592 P.2d 341]; *Feminist Women's Health Center* v. *Blythe* (1993) 17 Cal.App.4th 1543, 1568 [22 Cal.Rptr.2d 184].) Further, they have interpreted article I, section 2(a) to mean that ideas are protected from prior restraint. (*Pines* v. *Tomson* (1984) 160 Cal.App.3d 370, 393 [206 Cal.Rptr. 866].) If speech or press rights are abused, the abuser is held accountable for what he or she speaks, writes or publishes, but only after the exercise of those rights. (*Id.* at pp. 393-394.) Nevertheless, the government may impose reasonable time, place and manner restrictions on expression occurring on state property provided the regulations are not vague or overbroad. (*Robins* v. *Pruneyard Shopping Center, supra*, 23 Cal.3d at pp. 910-911.)

 The California courts have adopted a forum analysis to determine when the government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. (*Clark* v. *Burleigh* (1992) 4 Cal.4th 474, 482 [14 Cal.Rptr.2d 455, 841 P.2d 975].) To this end, the Supreme Court has divided public property into three categories: public, nonpublic and limited. The categories determine the applicable standard of review—strict scrutiny or reasonable basis—the court employs to examine government restrictions. (*Id.* at pp. 482-483.)

A public forum is the traditional soapbox in a town square: no one can be denied access and prior restraints are rarely permissible. (*Leeb* v. *DeLong, supra,* 198 Cal.App.3d at p. 56.) A nonpublic forum is public property that is not a public forum by tradition or design, such as a military base or a jail. (*Clark* v. *Burleigh, supra,* 4 Cal.4th at p. 483, fn. 9; *Prior Restraint, supra,* 20 Loyola L.A. L.Rev. at p. 1110.) A "house organ" school bulletin for the dissemination of educational or administrative information to students or faculty, over which school officials retain full power to regulate access and content, is an example of a nonpublic forum. (*Leeb* v. *DeLong, supra,* 198 Cal.App.3d at p. 56.)

The so-called limited forum is property the state has opened for expressive activity by part or all of the public. In a limited forum, the government's ability to regulate expression is greatly reduced, but it may restrict access to the forum consistent with the purposes for which it was created. (*Clark* v. *Burleigh, supra,* 4 Cal.4th at p. 483; *Leeb* v. *DeLong, supra,* 198 Cal.App.3d at p. 56.)

 "Official school publications" in California fall into the limited forum category. (*Leeb* v. *DeLong, supra,* 198 Cal.App.3d at pp. 56-57.) "Melancholianne" is conceptually no different than a school yearbook or newspaper produced in a journalism class. While the primary purpose for producing the videotape is to teach the students writing and film-making skills, by tradition, the film also has served as an avenue of student expression on a topic of interest to students. Past films addressed drugs, satanic cults and irrigation battles, and were shown to the student body and off-campus to the community. Thus, there is no reason to distinguish the student film from the student newspaper for forum analysis purposes; "Melancholianne" is a limited public forum.

When a school publication is deemed to be a limited public forum, school officials must demonstrate that the particular regulation of student expression advances a compelling state interest. In the educational setting, the

compelling state interests advanced are usually the interests in maintaining an environment where the educational process may occur without disruption and teaching students the boundaries of socially appropriate behavior. (*Bethel, supra,* 478 U.S. at pp. 683-686 [92 L.Ed.2d at pp. 558-560].) Here, the Board asserts a compelling state interest in fulfilling its basic educational mission which includes promoting "moral improvement" and teaching students to refrain from the use of profane and vulgar language. (Cal. Const., art. IX, § 1; Cal. Code Regs., tit. 5, § 300; § 44806.) That interest is a valid pedagogical objective.

School officials must also show that speech regulations are narrowly drawn to achieve the compelling interest. (*Prior Restraint, supra,* 20 Loyola L.A. L.Rev. at p. 1113.) The Board has done so here. The Board has not censored the students' expression of ideas; rather the Board has prohibited their expression of those ideas by the use of profane language. The Board's directive cannot be construed as the type of censorship which the California courts have deemed unconstitutional—censorship based on a disagreement with the views presented, or to avoid criticism of Board policy, or to avoid discussion of controversial issues. Rather, the Board's directive was content neutral and served a valid pedagogical objective. (Cf. *Bailey* v. *Loggins, supra,* 32 Cal.3d at p. 920.)

For all these reasons, the Board's directive to the film arts class teacher to have the students remove the profane language from the "Melancholianne" script was proper under section 48907. The profanity at issue was not protected speech under the statute because it violated the statute by failing to comport with professional standards of English and journalism. While the court below did not rely on this ground in granting summary judgment for the Board, we must affirm the judgment if it is supportable on another basis which establishes the Board must prevail as a matter of law. (*DiBona* v. *Matthews* (1990) 220 Cal.App.3d 1329, 1344 [269 Cal.Rptr. 882].)

As we have determined the Board was authorized to delete the profanity at issue because it violates the "professional standards of English and journalism" provision of section 48907, we need not consider other grounds offered to justify the restraint.

2. *Section 48950 does not prohibit the continued suppression of the video.*

█ Section 48950 reads in part: "(a) School districts operating one or more high schools and private secondary schools shall not make or enforce any rule subjecting any high school pupil to disciplinary sanctions solely on the basis of conduct that is speech or other communication that, when

engaged in outside of the campus, is protected from governmental restriction by the First Amendment to the United States Constitution or Section 2 of Article 1 of the California Constitution." Plaintiffs acknowledge this section was not operative until January 1, 1993, after the events at issue here. However, they submit, its current operative status renders unlawful the Board's continued suppression of the profanity in "Melancholianne." We disagree.

First, section 48950 prohibits disciplinary sanctions. No disciplinary sanctions are at issue here. Second, section 48950, subdivision (e) provides "[n]othing in this section shall be construed to supersede, or otherwise limit or modify, the provisions of Section 48907." As section 48907 governs the student speech at issue, that section, rather than section 48950, applies.

DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.

Thaxter, J., concurred.

ARDAIZ, P. J.—While I concur in the result, I respectfully disagree with the reasoning of the majority. My conclusion is that the specific statutory proscription of Education Code section 48907[1] against prior restraint applies to student journalistic endeavors and not to a movie prepared by students as part of or in conjunction with school curriculum.

The decision by the board of trustees (Board) found:

"The authoring, editing, and videotaping of a video project is plainly analogous to the selection, rehearsal, and performance of a school play, which has been likened by the [federal] courts to the selection and use of curriculum, and when such a video is produced as part of a classroom activity, as here, this Board finds that such a video constitutes curriculum or 'instructional material,' notwithstanding student authorship.

"Even if the video is construed to be an 'official school publication' subject to Education Code § 48907, this Board concludes that the Board has the authority to determine, within the confines of Education Code § 48907, whether profanity is educationally suitable in a classroom project such as the one at issue. . . ."

On the motion for summary judgment, the Board stated: "Melancholianne is a 'school-sponsored,' student-authored video."

---

[1] All statutory references are to the Education Code unless otherwise indicated.

The student-Plaintiffs stated: "For purposes of this motion, this Court may assume the video Melancholianne is an official school publication." In its order granting summary judgment for the Board, the court stated: "The Separate Statements were compared and plaintiffs' [students] proposition that, for purposes of this motion, the film was produced as part of the film arts class was accepted."

The briefs of the parties are plainly distinct in their positions. Appellants contend that section 48907 gives them the right to show "Melancholianne" whether or not the film is an official publication. Respondents contend that section 48907 does not give students the right to distribute "Melancholianne" regardless of whether it is an official school publication.

I conclude section 48907 applies to the general speech rights of students but the film is not an "official school publication."[2] Therefore, the restriction against prior restraint of "official school publications" does not apply. For this reason I do not concur that the analysis of the majority based on journalistic standards applies since that analysis assumes this is an "official school publication." However, I do not find that the free speech assurance of section 48907 precludes the school action taken here because this is a curriculum decision—not a restraint on free speech generally.

In other words, there are different rules depending on the context of the speech. For example, there is speech outside of school curriculum—the general speech rights of students on campus that do not involve the school or lend the imprimatur of the school to the speech. There is a statutory provision for speech in "official school publications." And, there is speech in the context of curriculum. I maintain that section 48907 does not address speech in the context of curriculum. Apparently, the majority's position is that student speech outside the context of "official school publication" is not subject to any form of restraint even in the context of curriculum. I respectfully cannot agree, particularly when the speech, because of the manner of dissemination, bears the imprimatur of the school. In my view, section 48907 pertains to free speech outside the context of curriculum and to

[2]The majority opinion acknowledges that "the parties have not raised or briefed the issue of whether the video is an official school publication" and adds that "we see no need to decide it." (Maj. opn., *ante*, at p. 1320, fn. 4.) The majority then relies upon the third paragraph of section 48907 to conclude that respondents can restrain the showing of "Melancholianne" because respondents can, in the words of the statute, "maintain professional standards of English and journalism." The third paragraph of the statute appears to expressly apply only to "official school publications." It also authorizes a "journalism adviser or advisers" to maintain those standards. In this case it is not disputed that the film arts class instructor, Mr. Moberg, was of the view that "the sparse use of profanity in the script was appropriate and good." It was higher school authorities (respondents) who deemed some of the language used to be inappropriate. It appears to me that the majority opinion in actuality rests upon an assumption that "Melancholianne" is an "official school publication." With this assumption I do not agree.

official school publications. The majority decision reaches far beyond a film. It may well bear on any efforts by schools to decide what they teach and how it will be taught, what may be performed at school functions and how it will be performed. Thus, I do not view respondents' action here as prior restraint in the context of general student expression encompassed by section 48907.

### "Melancholianne" Is Not an "Official School Publication" Within the Meaning of Section 48907

Regarding statutes, our goal is to apply the statute as closely to legislative intent as possible. In determining legislative intent, statutes are generally analyzed using a three-step process:

(1) The language is given its plain, ordinary meaning. If the meaning is without ambiguity or uncertainty, the language controls, and no further interpretation is needed. (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

(2) If the meaning is not clear, the legislative history of the statute and the historical circumstances of its enactment are used to ascertain legislative intent. (*Iverson* v. *Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 223 [38 Cal.Rptr.2d 35]; *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112, 1127 [26 Cal.Rptr.2d 231, 864 P.2d 502].)

(3) If the first two steps fail to reveal clear meaning, we apply reason, practicality and common sense to the language. (*Lampley* v. *Alvares* (1975) 50 Cal.App.3d 124, 128-129 [123 Cal.Rptr. 181].)

### Plain, Ordinary Meaning

Section 48907 states: " 'Official school publications' refers to material produced by students in the *journalism, newspaper, yearbook, or writing classes* . . . ." (Italics added.) The terms used in the statute clearly refer to written materials only.

Where the meaning of the language is clear and unambiguous, the statute must be applied literally. "Melancholianne" is a *video* production; thus, it falls outside of the statute's definition of "official school publications."

### Legislative History

If there is question regarding the clear meaning of the language, further analysis is necessary. Here, the legislative history of section 48907 reveals the same result as above.

Prior to section 48907, the law regarding students' freedom of expression was embodied in section 10611. Section 10611 read: " 'Students of the public schools have the right to exercise free expression including, but not limited to, the use of bulletin boards, the distribution of printed materials or petitions, and the wearing of buttons, badges, and other insignia, except that expression which is obscene, libelous, or slanderous according to current legal standards . . . .' " (*Bright* v. *Los Angeles Unified Sch. Dist.* (1976) 18 Cal.3d 450, 452, fn. 1 [134 Cal.Rptr. 639, 556 P.2d 1090].)

No specific reference was made to official student newspapers, which quickly led to controversy. In response, the California Legislative Counsel (Counsel) issued an opinion in 1974 concluding that section 10611 protected student expression in official student newspapers. This opinion is embodied in section 48907.

The only difference between sections 10611 and 48907 is the inclusion of material concerning "official school publications." Although the inclusion was the direct result of controversy over school newspapers, the Legislature chose to include not only newspapers, but also material produced in journalism, yearbook or writing classes. Clearly, other communicative devices were considered however, the Legislature chose only to include the written word.

Further evidence that only the written word was intended to be included in section 48907's definition of official publication can be found throughout other California statutes. Where the Legislature intended to include multiple media devices, the devices are individually named.

For example, Penal Code section 311, regarding "obscene matter," states: " 'Matter' means any book, magazine, *newspaper* or other printed or written material or any picture, drawing, photograph, *motion picture*, or other pictorial representation or any statute or other figure, or any recording, transcription or mechanical, chemical or electrical reproduction or any other articles, equipment, machines or materials." (Pen. Code, § 311, subd. (b), italics added.) In addition, Business and Professions Code section 651, regarding healing arts, states: "Dissemination of false . . . information . . . by . . . television, radio, *motion picture, newspaper*, book . . . ." (Italics added.)

Analysis of the above statutes reveals that the Legislature clearly distinguishes written materials from motion picture material.

The jobs of the courts and the Legislature are separate. If audio-visual media, such as videos, are to be protected by section 48907 as official school publications, it is the job of the Legislature to amend the statute and make

this intent clear. As such, we are bound by the existing language of the statute, and should conclude that "Melancholianne," a video, is unprotected by the proscription on prior restraint imposed by section 48907.[3]

Since I maintain "Melancholianne" is not an "official school publication" as that term is used in the statute, the issue becomes whether section 48907 places any restrictions upon the school administration regarding speech which is not an "official school publication." Section 48907 does make reference to the free speech rights of students without specific reference to medium. "Students of the public schools shall have the right to exercise freedom of speech and of the press including, but not limited to, the use of bulletin boards, the distribution of printed materials or petitions, the wearing of buttons, badges, and other insignia . . . ." Thus, the statute by its terms acknowledge that students have the right to exercise freedom of speech. Further, there is no question that the Legislature can grant greater rights to its citizens than are provided in the Constitutions of California or of the United States, so long as those rights do not otherwise conflict with constitutional provisions. The question becomes, did the Legislature intend by the general statement just set forth to give greater rights than those constitutionally required? Realistically, section 48907 would be unnecessary if students had the same free speech rights as adults. I suggest that the analysis of this issue lies within the interpretation and history of section 10611 which was the precursor to section 48907 and a reaction to *Tinker* v. *Des Moines School Dist.* (1968) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733].

As noted in the majority opinion, the evolution of section 10611 was a response to two federal district court decisions referred to as *Rowe I* and *Rowe II*, which interpreted the predecessor sections to 10611, sections 9012 and 9013.

"In *Tinker* v. *Des Moines School Dist.*, [ *supra*,] the United States Supreme Court, in a landmark decision, gave emphatic recognition to the exercise by students of the right of freedom of speech within a public school environment. 'First Amendment rights, applied in the light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.' [Citation.] However, these rights of students must be balanced against the

---

[3]The Board actually ordered the disputed language to be deleted from a written script of the video. Although this may seem to place the issue within the realm of the written word (protected to a limited degree by § 48970), it is important to note that the script itself was never intended to be released in any way to the public. The script was merely a precursor to the video.

rights—indeed the obligations—of school authorities to administer the school and discipline the students. Thus the high court continued: 'On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.' [Citation.] *Tinker* then resolved the conflict between these competing rights, declaring that the student may exercise his right to freedom of expression unless the 'conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others . . . .' [Citation.] Any regulation prohibiting student expression 'would violate the constitutional rights of students, at least if it could not be justified by a showing that the students' activities would materially and substantially disrupt the work and discipline of the school.' [Citation.]

" . . . . . . . . . . . . . . . . . . . . . . . . . . .

"In *Rowe I* the court struck down sections 9012 and 9013 as void for vagueness and unconstitutionally overbroad and thus restrictive of the First Amendment rights of public school students upheld in *Tinker*. The *Rowe* court retained continuing jurisdiction over the matter and opined that 'a system of prior review may be constitutionally permissible in the secondary school setting.' The school district involved in *Rowe* responded to this invitation with alacrity and proposed a set of prior restraint censorship rules for the court's approval. In its second unreported opinion, filed on February 4, 1971 (*Rowe II*), the court rejected the proposed system of prior restraint as 'too encompassing and potentially devastating to withstand constitutional scrutiny.' The court went on to say: 'It may be that no system of prior restraint in the area of student publications can be devised which imposes a restraint sufficiently short-lived and procedurally protected to be constitutional. What may well be best—although perhaps not constitutionally compelled—is a *simple prohibition against the distribution of certain categories of material.* This could be coupled with the prior submission of the material to school authorities for informational purposes only, and with reasonable time, place and manner regulations. This straightforward system would allow the unfettered distribution of student publications except in those instances where the content of the material is outside the protections of the First Amendment. In such an instance, the school authorities could prevent distribution by prior court order.' (Italics added.) The court concluded by inviting the State Board of Education to promulgate statewide guidelines in this area." (*Bright* v. *Los Angeles Unified Sch. Dist., supra,* 18 Cal.3d 450, 455-456, 459-460.)

Analyzing the evolution of section 10611 in light of *Rowe I* and *Rowe II*, as well as *Tinker*, our Supreme Court concluded: "Apparently in response to the *Rowe* decision, the California Legislature in 1971 repealed sections 9012 and 9013 which had banned certain publications from school campuses . . . and enacted section 10611. Undoubtedly aware of *Tinker's* strong endorsement of the exercise by public school students of their rights to freedom of speech and expression on the school campus, the Legislature itself proclaimed *such rights for California students in section 10611*. This right of expression, oral and written, is subject to reasonable time, place and manner regulations but does not extend to certain prohibited expression, namely that 'which is obscene, libelous or slanderous according to current legal standards, or which so incites students as to create a clear and present danger of the commission of unlawful acts on school premises or the violation of lawful school regulations or the substantial disruption of the orderly operation of the school . . . .' " (*Bright* v. *Los Angeles Unified Sch. Dist., supra,* 18 Cal.3d at p. 458, italics added.)

Therefore, I conclude that our Supreme Court recognized that the Legislature intended to ensure to students the same freedoms that were defined by *Tinker*. They did this by statute in section 10611. However, I find no basis to conclude that they intended any greater rights than *Tinker* had interpreted under the United States Constitution.

As noted in the majority opinion, however, "*Bright* invalidated the school's prior restraint system because section 10611 did not authorize prior restraints. However, the court indicated its decision did not preclude the Legislature from establishing a system of prior restraint in a school environment."

Because of this, section 10611 was specifically amended to address prior restraint in "official school publications." Of course, assuming *Tinker* precluded the type of prior restraint addressed by section 48907, then amending section 10611 was unnecessary. However, it is reasonably clear the Supreme Court did not conclude the Legislature was constitutionally precluded from permitting such prior restraint.

"For the foregoing reasons, we hold that section 10611 does not authorize school districts to establish systems of prior restraint in respect to the distribution of the prohibited categories of expression delineated in the statute. We do not say that the Legislature could not constitutionally establish such a system in the public school environment. We say only that it has not done so." (*Bright* v. *Los Angeles Unified Sch. Dist., supra,* 18 Cal.3d at p.

464.) Thus, section 48907 specifically addressed "official school publications" and placed specific limits on the extent of prior restraint that could be imposed on such publications. Accordingly, I conclude that aside from "official school publications," there is no basis to find that section 48907 confers any greater free speech rights upon students than provided under the Constitution of the United States or of California. In my view, therefore, "Melancholianne" is subject to the strictures that may be placed on student speech dependent on the context—free speech generally or involving curriculum. Likewise, I find no basis to conclude *Bright* addressed curriculum issues as opposed to speech that falls outside of curriculum considerations. I further conclude section 48907 does not pertain to curriculum except to the extent "official school publication" may be so defined. Therefore, I maintain section 48907 does not preclude the restriction imposed here.

### *Editorial Review of "Melancholianne" Is Not a Violation of Students' Constitutional Rights*

School officials have the difficult task of maintaining order and discipline in the school setting, while being careful not to infringe upon students' constitutional rights. Among the most important rights imparted to adults and students alike is freedom of expression, guaranteed by the First Amendment. However, "the constitutional rights of students in the public school are not automatically coextensive with the rights of adults." (*Bethel School Dist. No. 403* v. *Fraser* (1986) 478 U.S. 675, 682 [92 L.Ed.2d 549, 558, 106 S.Ct. 3159].) The school setting, combined with the relative immaturity of high-school students, produces a special need for scrutiny of student expression.

"[I]t must be recognized that a student may be subject to far more stringent regulations than an adult outside a school environment due to his immaturity and status as a student in a school environment where disciplinary and health problems and considerations relating to safety of minors take on special significance. '. . . where there is an invasion of protected freedoms "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults. . . ."' [Citation.]" (*Montalvo* v. *Madera Unified Sch. Dist. Bd. of Education* (1971) 21 Cal.App.3d 323, 330 [98 Cal.Rptr. 593].)

### *The School as a Public Forum*

The Supreme Court has long held that "students and teachers do not shed their constitutional rights at the schoolhouse gate." (*Tinker* v. *Des*

*Moines School Dist., supra,* 393 U.S. at p. 506 [21 L.Ed.2d at p. 737].) "In places which by long tradition or government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed." (*Perry Ed. Assn.* v. *Perry Local Educators' Assn.* (1983) 460 U.S. 37, 45 [74 L.Ed.2d 794, 804, 103 S.Ct. 948].)

" '[T]he [Supreme] Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum.' " (*Clark* v. *Burleigh* (1992) 4 Cal.4th 474, 482 [14 Cal.Rptr.2d 455, 841 P.2d 975], citing *Cornelius* v. *NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788, 799-800 [87 L.Ed.2d 567, 579, 105 S.Ct. 3439].)

The students argue that by showing "Melancholianne" to the public as part of a competition, their activities constituted protected speech under the "public forum" theory. However, the Supreme Court has recognized that " '[e]ven protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. . . . The extent to which the Government can control access depends on the nature of the relevant forum.' " (*Clark* v. *Burleigh, supra,* 4 Cal.4th at p. 482, quoting *Cornelius* v. *NAACP Legal Defense & Ed. Fund, supra,* 473 U.S. at pp. 799-800 [87 L.Ed.2d at p. 578].)

"Public property which is not by tradition or designation a forum for public communication is governed by different standards." (*Perry Ed. Assn.* v. *Perry Local Educators' Assn., supra,* 460 U.S. at p. 46 [74 L.Ed.2d at p. 805].)

For purposes of forum analysis, the Supreme Court has divided all public property into three categories: (1) traditional public forum, (2) designated public forum, and (3) all remaining public property.

A. *"Traditional Public Forum"*

A traditional public forum is "a place that by long tradition has been used by the public at large for the free exchange of ideas." (*Clark* v. *Burleigh,*

*supra*, 4 Cal.4th at p. 482.) "[P]ublic streets and parks may be the only places that the high court has yet recognized as 'traditional public forums.'" (*Ibid.*, citing *Ward* v. *Rock Against Racism* (1989) 491 U.S. 781, 790-791 [105 L.Ed.2d 661, 674-675, 109 S.Ct. 2746].)

"Melancholianne" was neither produced nor exhibited in the public streets or parks; therefore, it does not constitute a "traditional public forum."

## B. *"Designated Public Forum"*

A designated public forum, or "limited public forum" is "'property that the state has opened for expressive activity by part or all of the public.'" (*Clark* v. *Burleigh, supra*, 4 Cal.4th at p. 483, citing *Intern. Soc. for Krishna Consciousness* v. *Lee* (1992) 505 U.S. 672, __ [120 L.Ed.2d 541, 550, 112 S.Ct. 2701, 2705].) "[T]here are few examples of designated public forums in Supreme Court jurisprudence because the court has rarely—and not at all in the past decade—placed any property in this category." (*Ibid.*, fn. omitted.)

## C. *"Remaining Public Property"*

All remaining public property is frequently referred to as the "nonpublic forum." "[A] 'nonpublic forum' is simply public property that is not a public forum by tradition or design." (*Clark* v. *Burleigh, supra*, 4 Cal.4th at p. 483, fn. 9.)

"'Limitations on expressive activity conducted in this last category of property must survive only a much more limited review. The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view.'" (4 Cal.4th at p. 483, citing *Intern. Soc. for Krishna Consciousness* v. *Lee, supra*, 505 U.S. at p. __ [120 L.Ed.2d at p. 550, 112 S.Ct. at pp. 2705-2706].)

Therefore, I conclude that the rights of the students here rest on a nonpublic forum analysis. In essence, I contend a high school such as this is not a public forum. While section 48907 may give free speech rights, it does so only in the relevant context. In other words, section 48907 confers no greater rights than are provided in the nonpublic forum analysis. In that context, it is long recognized that schools may enforce curriculum standards that preclude certain types of activity. Further, such restrictions do not constitute violations of the First Amendment. The distinction is between

speech that is outside of the school curriculum and speech within school curriculum. While section 48907 may address "noncurriculum" speech, it does not in any way address traditional curriculum decisions, at least insofar as those decisions do not involve "official school publications."

### Production of "Melancholianne" Was Part of the School's Curriculum

Curriculum is defined as "all planned school activities including besides courses of study organized play, athletics, dramatics, club and home-room program." (See Webster's New Internat. Dict. (3d ed. 1981) p. 557.)

California has progressed one step further by defining curriculum within the Education Code. Section 51013 states " 'curriculum' means the courses of study, courses, subjects, classes and organized group activities provided by a school." Section 51016 further states that " 'class' means an organized group of pupils within a school who are pursuing a particular course, subject or activity."

The students (appellants) produced "Melancholianne" in conjunction with their school's "Film Arts Class." The students worked together to pursue a particular activity; therefore, as defined above, the student's activities would constitute curriculum.

"[E]ducators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school . . . may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences. [¶] Educators are entitled to exercise greater control over this . . . form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school. Hence, a school may in its capacity as publisher of a school newspaper or producer of a school play 'disassociate itself,' [citation], not only from speech that would 'substantially interfere with [its] work . . . or impinge upon the rights of other students,' [citation], but also from speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences." (*Hazelwood School District* v. *Kuhlmeier*

(1988) 484 U.S. 260, 271 [98 L.Ed.2d 592, 605, 108 S.Ct. 562], fns. omitted.)

"A school must be able to set high standards for the student speech that is disseminated under its auspices . . . and may refuse to disseminate student speech that does not meet those standards." (484 U.S. at pp. 271-272 [98 L.Ed.2d at pp. 606-607].)

*Leeb* v. *DeLong* (1988) 198 Cal.App.3d 47 [243 Cal.Rptr. 494] notes that section 48907 gives students greater editorial control over official school publications than students would otherwise have under *Hazelwood*. As the court stated in *Leeb*: "If *Kuhlmeier* were specifically applicable in California, little more would have to be said. But it is not. Section 48907 of the Education Code and California decisional authority clearly confer editorial control of official student publications on the student editors alone, with very limited exceptions." (198 Cal.App.3d at p. 54, fn. omitted.)

Again, the distinction is drawn between curriculum and other contexts for speech. While I acknowledge that "official school publication" may in some instances overlap with curriculum, I find no basis to conclude that all other curriculum, or speech within the context of that other curriculum, enjoys the freedom statutorily conferred on student free speech generally.

Clearly, a school district and school officials must have some authority over materials and activities that bear the imprimatur of the school. Certainly, the district and officials will be held accountable for the programs and principles they espouse and teach.

### The School Board Has the Right to Exercise Broad Discretion Over Curriculum

School officials are not powerless with regard to the expression of ideas by students. Given the special setting of the school, the Supreme Court has granted such officials broad discretion over its own affairs.

"[S]chool boards have broad discretion in the management of school affairs. . . . [B]y and large, 'public education in our Nation is committed to the control of state and local authorities,' and . . . federal courts should not

ordinarily 'intervene in the resolution of conflicts which arise in the daily operation of school systems.'. . . [W]e have 'repeatedly emphasized . . . the comprehensive authority of the States and of school officials . . . to prescribe and control conduct in the schools.' " (*Board of Education* v. *Pico* (1982) 457 U.S. 853, 863-864 [73 L.Ed.2d 435, 444-445, 102 S.Ct. 2799].)

"[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges. [Citations.] It is only when the decision to censor a school-sponsored publication, theatrical production, or other vehicle of student expression has no valid educational purpose that . . . judicial intervention [is required] to protect students' [free speech] rights." (*Hazelwood School District* v. *Kuhlmeier, supra*, 484 U.S. at p. 273 [98 L.Ed.2d at pp. 606-607].)

This court has also recognized that school officials are allowed to regulate student speech in specific contexts.

" '[E]ducators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions *are reasonably related to legitimate pedagogical concerns.* . . . [S]uch school-sponsored expressive activities [are characterized] as part of the school curriculum 'so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants . . . . [E]ducators are entitled to exercise greater control over such activities to assure that participants learn whatever lessons the activity is designed to teach' and that 'readers or listeners are not exposed to material that may be inappropriate for their level of maturity.' " (*McCarthy* v. *Fletcher* (1989) 207 Cal.App.3d 130, 145 [254 Cal.Rptr. 714], citing *Hazelwood School District* v. *Kuhlmeier, supra*, 484 U.S. 260, italics added.)

Thus, as long as a restriction has a legitimate pedagogical concern, school officials may regulate speech in the curriculum context which they consider "inappropriate" given the school setting and maturity level of the students.

Here, appellants demand the use of school facilities without restraint by those held accountable. It is one thing to allow students the right to express themselves. It is quite another to require the school to indirectly endorse the manner in which it is done. All that is involved here is the question of whether the school authorities have the power over their curriculum and their film-making facilities to impose limitations upon their use. I conclude

all they must show is a legitimate pedagogical concern. There is no prior restraint exercised here in the constitutional context. There is no right in the first instance for appellants to bend the school curriculum into an unrestricted forum. To say that *Bright* allows speech without restraint in the curriculum context would deprive the school of any effective authority and would turn curriculum into a public forum. Furthermore, to state that *Bright* prohibits all restraint on material beyond "official school publications," including curriculum, would undermine the authority given to school officials acknowledged in *McCarthy*.

### Pedagogical Purpose

As noted, school curriculum choices must be related to reasonable pedagogical concerns.

"The universe of legitimate pedagogical concerns is by no means confined to the academic; as the Supreme Court put it in *Fraser*, 'schools must teach by example the shared values of a civilized social order.' 478 U.S. at 638, 106 S.Ct. at 3165. Sometimes, of course, these 'shared values' come in conflict with one another; independence of thought and frankness of expression occupy a high place on our scale of values, or ought to, but so too do discipline, courtesy, and respect for authority. Judgments on how best to balance such values may well vary from school to school. Television has not yet so thoroughly homogenized us that conduct deemed unexceptionable in New York City, for example, will necessarily be considered acceptable in rural Tennessee.

"Local school officials, better attuned than we to the concerns of the parents/taxpayers who employ them, must obviously be accorded wide latitude in choosing which pedagogical values to emphasize, and in choosing the means through which those values are to be promoted. We may disagree with the choices, but unless they are beyond the constitutional pale we have no warrant to interfere with them. Local control over the public school, after all, is one of this nation's most deeply rooted and cherished traditions. See *Milliken* v. *Bradley*, 418 U.S. 717, 741-42, 94 S.Ct. 3112, 3125-26; 41 L.Ed.2d 1069 (1974)." (*Poling* v. *Murphy* (6th Cir. 1989) 872 F.2d 757, 762, cert. denied, 493 U.S. 1021 [107 L.Ed.2d 742, 110 S. Ct. 723].)

Along with the broad discretion over curriculum afforded school officials, the California Legislature created a statute directly related to appropriate expression within the confines of the school setting. Section 44806, entitled

"duty concerning instruction of pupils concerning morals, manners, and citizenship," states:

"Each teacher shall endeavor to impress upon the minds of the pupils the principles of morality, truth, justice, patriotism, and a true comprehension of the rights, duties, and dignity of American citizenship, including kindness toward domestic pets and the humane treatment of living creatures, to teach them to avoid idleness, profanity, and falsehood, and to instruct them in manners and morals and the principles of a free government."

"A school need not tolerate student speech that is inconsistent with its 'basic educational mission.'" (*Hazelwood School District* v. *Kuhlmeier, supra,* (1988) 484 U.S. at p. 266 [98 L.Ed.2d at p. 602].)

Certain language was used throughout "Melancholianne" to "make its point." While the intent of the students was proper and even laudable, the school administration acted well within its authority in concluding that some of the methods used were not.

"[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the *prevention* and punishment of which have never been thought to raise any Constitutional problem. These include the *lewd and obscene, the profane,* [and] the libelous . . . . It has been well observed that *such utterances are no essential part of any exposition of ideas,* and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (*Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568, 571-572 [86 L.Ed. 1031, 1035, 62 S.Ct. 766], fns. omitted, italics added.) Some language has long been categorized as profane by virtue of its lewd and socially inappropriate character. Conduct is also regarded as obscene under some circumstances. Words can describe conduct and be obscene in the constitutional sense. However, words can themselves have lewd and indecent connotations and be "obscene" in the colloquial sense, or profane but not "obscene" in the constitutional sense. I would support this argument by initial reference to *Bethel School, supra.*

"We have also recognized an interest in protecting minors from exposure to vulgar and offensive spoken language. In *FCC* v. *Pacifica Foundation,* 438 U.S. 726 (1978), we dealt with the power of the Federal Communications Commission to regulate a radio broadcast described as 'indecent but

not obscene.' There the Court reviewed an administrative condemnation of the radio broadcast of a self-styled 'humorist' who described his own performance as being in 'the words you couldn't say on the public, ah, airwaves, um, the ones you definitely wouldn't say ever.' *Id.*, at 729; see also *id.*, at 751-755 (Appendix to opinion of the Court). The Commission concluded that 'certain words depicted sexual and excretory activities in a patently offensive manner, [and] noted that they "were broadcast at a time when children were undoubtedly in the audience." ' The Commission issued an order declaring that the radio station was guilty of broadcasting indecent language in violation of 18 U.S.C. § 1464. 438 U.S., at 732. The Court of Appeals set aside the Commission's determination, and we reversed, reinstating the Commission's citation of the station. We concluded that the broadcast was properly considered 'obscene, indecent, or profane' within the meaning of the statute. The plurality opinion went on to reject the radio station's assertion of a First Amendment right to broadcast vulgarity:

" 'These words offend for the same reasons that obscenity offends. Their place in the hierarchy of First Amendment values was aptly sketched by Mr. Justice Murphy when he said: "[S]uch utterances are no essential part of any exposition of ideas, and are of such slight social value as to step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky* v. *New Hampshire*, 315 U.S., at 572.' *Id.*, at 746." *(Bethel School Dist. No. 403* v. *Fraser* (1986) 478 U.S. 675, 684-685 [92 L.Ed.2d 549, 559-560, 106 S.Ct. 3159].)

In *Bethel*, the United States Supreme Court approved punishment of a student for using sexual innuendoes during a student speech. The court stated that "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." (478 U.S. at p. 683 [92 L.Ed.2d at p. 558].)

I do not see any distinction between the language used in "Melancholianne" and its construction as lewd, profane, vulgar and indecent. Apparently, neither does the United States Supreme Court. Further, the words used in the context of the speech here clearly are subject to constitutional restraint unless it may be concluded the Legislature intended freedoms beyond those provided by the Constitution. I see no basis to find such largess. I do not believe anyone could reasonably argue that any of these words could be used without consequence in a classroom or a school function, or directed to a teacher, administrator or other student. The students' intent to convey the importance of avoiding teen pregnancy is admirable. However, the language used here is neither necessary nor appropriate. Allowing use of such words

does not promote morality or advance the basic educational mission. They are, in my view, without constitutional or statutory protection in the context before us.

The situation before us raises no risk of "freewheeling censorship." "Melancholianne," a production as part of the school curriculum, was made by Valley High School students to impress upon their peers the hardships of teenage parenthood. School officials were provided a script of "Melancholianne" before the video was produced, and therefore knew *exactly* the content and language to be used. Specific words constituting inappropriate expression were included in the script, and only those words were sought to be excluded.

In addition, there was no effort to chill the idea to be conveyed by "Melancholianne." School officials attempted to prohibit conveyance of inappropriate expression to other students and the public. The idea of preventing teen pregnancies was never an issue under attack by school officials.

The implications of appellants' argument are far-reaching. If the school cannot exercise curriculum control over editing "Melancholianne" to remove words of inappropriate expression, then a school could not bar a T-shirt bearing the same expression from being worn during a school play.

As I have argued, the risk of censorship is that it will inhibit the exposition of ideas. Where it cannot be judged with certainty that specific words may be used to convey an idea as opposed to the general expression of an idea, we are loathe to prohibit the expression of the idea at the risk of hearing offensive words. However, this is simply not the case before us. We do not have a student expressing his or her opinion in the student commons and using inappropriate speech. It would be highly suspect if not patently improper to bar the speech because of fear of the words. The fear may prove groundless and the words, though offensive, may be judged and punished in retrospect with certainty in their utterance. Here, the authorities knew exactly what the words were. They were not only scripted, they were filmed. If such words can be prohibited at all and punished for the utterance, they can be barred when their exposition is certain. In my view, an entirely justifiable curriculum decision was made.

Here, the school authorities tolerated the idea conveyed. They were not, however, required to condone these words by the implied action of allowing distribution of a film.

*Conclusion*

Although high school students are guaranteed freedom of expression through the First Amendment, this right is not absolute. School officials have a more extensive right to control expression in the school setting given the students' age and level of maturity, and the school officials' desire to teach morality as part of the educational mission. The use of profane or obscene and vulgar language is not an essential part of any exposition of ideas. As such, use of this language under the auspices of the school is subject to appropriate restriction within the context of any other curriculum decision. These authorities simply determined that they would not allow their facilities to produce a film that placed the school's imprimatur upon words directly inconsistent with the school's educational mission. I find no fault in this and I see no great constitutional struggle. Allowing the conduct here exposes the school to the entirely justifiable charge that they are endorsing inappropriate language. It is the school's statutory obligation to deter this conduct, not make a movie utilizing this conduct. With all due respect to my colleagues, *Bright* simply cannot be reasonably interpreted as equating student speech generally with student speech in the context of curriculum.

On June 8, 1995, the opinion was modified to read as printed above.