[No. B062791. Second Dist., Div. Six. Sept. 10, 1992.]

RUSSELL LAWRENCE LEE, Petitioner and Appellant, v.
THE SUPERIOR COURT OF VENTURA COUNTY, Respondent.

**COUNSEL**

Russell Lawrence Lee, in pro. per., for Petitioner and Appellant.

James L. McBride, County Counsel, and Frank O. Sieh, Assistant County Counsel, for Respondent.

**OPINION**

**YEGAN, J.**—Approximately 10 years ago, the California Supreme Court publicly censured a superior court judge for his use of racial epithets, including the word "nigger." (*In re Stevens* (1982) 31 Cal.3d 403, 404 [645 P.2d 99].) Ironically, today, we are compelled to rule upon an African-American's request for court authorization to change his name to "Misteri Nigger." As we shall explain, the judiciary should not lend the Great Seal of the State of California to aid appellant in his social experiment. The proposed surname is commonly considered to be a racial epithet and has the potential to be a "fighting word." Appellant has the common law right to use whatever name he chooses. He may conduct whatever social experiment he chooses. However, he has no statutory right to require the State of California to participate therein.

Russell Lawrence Lee appeals from an order denying an application for court approval to change his name from Russell Lawrence Lee to "Misteri Nigger." (Code Civ. Proc., §§ 1275, 1278.)[1] At oral argument, appellant said that the second "i" in Misteri is silent and that the proposed name is pronounced "Mister Nigger." Appellant has not demonstrated that the trial court abused its discretion as a matter of law in denying the request. We therefore affirm and hold that the appellant has no statutory right to court approval of a name that is a racial epithet, i.e., a disparaging or abusive word which may be a "fighting word."

Appellant, a 60-year-old educator, filed an application seeking court approval of a surname that he claims is intended to achieve social justice, i.e., to ". . . steal the stinging degradation—the thunder, the wrath, the shame and racial slur—from the word nigger." He theorizes that his use of the name, with court approval, could be used to conquer racial hatred. He concedes the proposed surname is "the most provocative, emotionally-charged and explosive term in the language." His opening brief states that the "[n]ame change to me personally means nothing; not even a sacrifice. It is a minor thing."

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

### Discretion and the Statutory Scheme

■ The Legislature has provided that the trial court ". . . *may* make an order changing the name, or dismissing the application, as to the court may seem right and proper." (§ 1278, subd. (a), italics added.) That is to say, the trial court is vested with discretionary power to grant or deny a request for a name change.

■ "[T]he exercise of the trial court's discretion will be disturbed only for a clear abuse [citation], and . . . if there is any basis upon which the action can be sustained, the ruling of the trial court must be upheld on appeal. [Citation.]" (*In re Ritchie* (1984) 159 Cal.App.3d 1070, 1072-1073 [206 Cal.Rptr. 239].) " ' "The term [judicial discretion] implies absence of arbitrary determination, capricious disposition or whimsical thinking. It imports the exercise of discriminating judgment within the bounds of reason. [Par.] To exercise the power of judicial discretion all the material facts in evidence must be both known and considered, together also with the legal principles essential to an informed, intelligent and just decision." [Fn. omitted.]' (*In re Cortez* (1971) 6 Cal.3d 78, 85-86 [98 Cal.Rptr. 307, 490 P.2d 819].)" (*In re Marriage of Martin* (1991) 229 Cal.App.3d 1196, 1200 [280 Cal.Rptr. 565].) Each case must stand upon its own particular facts. (*In re Useldinger* (1939) 35 Cal.App.2d 723, 727 [96 P.2d 958].) The facts of this case are unique.

■ Appellant has a common law right to change his name to "Misteri Nigger" without the necessity of any legal proceeding. ■ A section 1276 proceeding provides a public record of the name change. (*Weathers* v. *Superior Court* (1976) 54 Cal.App.3d 286, 288 [126 Cal.Rptr. 547]; 4 Witkin, Summary of Cal. Law (9th ed. 1987) Personal Property, § 16, p. 20.) Once the name is approved by the court, the decree is filed with the Secretary of State. (§ 1279.) However, no person has a statutory *right* to officially change his or her name to a name universally recognized as being offensive.

"The Fourteenth Amendment's mandate that race discrimination be eliminated from all official acts and proceedings of the state is most compelling in the judicial system. [Citation.]" (*Powers* v. *Ohio* (1991) 499 U.S. __, __ [113 L.Ed.2d 411, 428, 111 S.Ct. 1364].) Were we to give our imprimatur to appellant's request, such might be construed as encouraging or sanctioning a racial epithet, translating to "state action" promoting racial disharmony. (See *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 537 [50 Cal.Rptr. 881, 413 P.2d 825]; see also 8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 597, pp. 48-49.)

■ "[T]he trial court may properly deny the application if the name was adopted to defraud, intentionally confuse or intrude into someone's privacy . . . [or for] additional reasons . . . ." (*In re Ritchie, supra,* 159 Cal.App.3d at p. 1072.) "[S]ome substantial reason must exist for the denial . . . ." (*In re Ross* (1937) 8 Cal.2d 608, 610 [67 P.2d 94, 110 A.L.R. 217].) Only two reported California cases have upheld the discretionary denial of a section 1276 application. In *In re Ritchie, supra,* the trial court denied a petitioner's application to change his name to the Roman numeral "III" (pronounced "three"). The order was affirmed on appeal because the proposed surname was inherently confusing and not a legitimate "name." In *In re Weingand* (1964) 231 Cal.App.2d 289 [41 Cal.Rptr. 778] the trial court denied an application because the petitioner intended to misappropriate the name of a famous movie star, Peter Lorre. The order was affirmed and appellant was not permitted to "cash in" on the real Peter Lorre's name. Thus, in both cases, there was a "substantial" and principled reason for denial.

### Racial Epithet

■ Appellant has no statutory right to court approval of a name that by his own theory is a racial epithet which provokes violence. The trial court, in the broad exercise of its discretion, determined that the proposed surname was vulgar, offensive, and a racial slur. Here, as in *Ritchie* and *Weingand,* the trial court articulated a "substantial" and principled reason for denial of the motion.

■ In a related context, the Legislature has given the Department of Motor Vehicles discretion to reject requests for personalized license plates ". . . that may carry connotations offensive to good taste and decency. . . ." (Veh. Code, § 5105.) No violation of the First Amendment is occasioned thereby. (*Katz* v. *Department of Motor Vehicles* (1973) 32 Cal.App.3d 679, 684-685 [108 Cal.Rptr. 424].) We opine that if appellant had requested a license plate with the word "nigger," his application would be rejected.

■ The word "nigger" is commonly used and understood as a demeaning and offensive racial slur. (See Webster's New Internat. Dict. (3d ed. 1986) p. 1527, col. I; The American Heritage Dict. (2d college ed.) p. 841, col. II.) The trial court's finding is also consistent with the views of the California Supreme Court: "Although the slang epithet 'nigger' may once have been in common usage, along with other racial characterizations as 'wop,' 'chink,' 'jap,' 'bohunk,' or 'shanty Irish,' the former expression has become particularly abusive and insulting in light of recent developments in the civil rights' movement as it pertains to the American Negro." (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498, fn. 4 [86 Cal.Rptr. 88, 468 P.2d 216].)

Appellant claims that by taking the surname "Nigger" he will take the sting out of the word. We do not question appellant's sincerity in seeking the official name change. However, appellant's premise is, at the very least, suspect. His quest for social justice should not be viewed in a vacuum. "One feature of strong insults and epithets is that they tend to shock those at whom they are directed *and* others who hear." (Greenawalt, *Insults and Epithets: Are They Protected Speech?* (1990) 42 Rutgers L.Rev. 287, 291.) We presume that at least some African-Americans would not be in agreement with appellant's methods and might suffer embarrassment and shock by his use of the epithet as his official name.

■ "To preserve the integrity and impartiality of the judicial system, each judge should: . . . In all judicial proceedings, refrain from engaging in conduct and prohibit others from engaging in conduct that exhibits . . . [racial] bias." (Cal. Standards Jud. Admin., § 1, adopted Jan. 1, 1987.) While this standard is expressly directed to judicial proceedings, it is apparent that we should not make orders or reverse trial court orders which may have the effect of contributing to racial disharmony.

■ "The use of the term 'nigger' has no place in the civil treatment of a citizen by a public official." (*City of Minneapolis v. Richardson* (1976) 239 N.W.2d 197, 203 [239 N.W.2d. 197, 85 A.L.R.3d 389].) This rule is broad enough to preclude judicial approval of appellant's use of the name "Misteri Nigger," even at his own request. We stress that we are aware of appellant's stated motive that the name change will lessen racial bias and tension. As indicated, we question the accuracy of appellant's appraisal. At the same time, we unequivocally wish the word would simply fall out of use in the English language.

"American society remains deeply afflicted by racism. Long before slavery became the mainstay of the plantation society of the antebellum South, Anglo-Saxon attitudes of racial superiority left their stamp on the developing culture of colonial America. [Fn.] Today, over a century after the abolition of slavery, many citizens suffer from discriminatory attitudes and practices, infecting our economic system, our cultural and political institutions, and the daily interactions of individuals. [Fn.] The idea that color is a badge of inferiority and a justification for the denial of opportunity and equal treatment is deeply ingrained. [¶] The racial insult remains one of the most pervasive channels through which discriminatory attitudes are imparted. [Fn.] Such language injures the dignity and self-regard of the person to whom it is addressed, communicating the message that distinctions of race are distinctions of merit, dignity, status, and personhood. [Fn.] Not only does the listener learn and internalize the messages contained in racial insults,

[fn.] these messages color our society's institutions and are transmitted to succeeding generations. [Fn.]" (Delgado, *Words That Wound: A Tort Action for Racial Insults, Epithets, and Name-Calling* (1982) 17 Harvard Civil Rights-Civil Liberties L.Rev. 133, 135-136.)

## *Fighting Words*

Here, the surname has the potential to be in the "fighting words" category. At oral argument, appellant pointed out that use of this epithet by a motorist involved in a recent minor Los Angeles traffic accident caused a homicide. Appellant concedes the epithet is a "fighting word" even though he seeks to remove it from that category by taking the name.

█ In *Chaplinsky* v. *State of New Hampshire* (1942) 315 U.S. 568 [86 L.Ed. 1031, 62 S.Ct. 766], the United States Supreme Court articulated the "fighting words" exception to the First Amendment's guarantee of freedom of speech. Mr. Chaplinsky referred to a police officer as a "damned racketeer" and a "damned fascist" and was convicted of violating a statute which proscribed the use of " '. . . any offensive, derisive, or annoying word to any other person . . . nor call him by any offensive or derisive name . . . ." (*Id.*, at p. 569 [86 L.Ed. at p. 1034].) The Supreme Court upheld his conviction saying: "[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. [Fn.] There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. [Fn.] These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. [Fn.] It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. [Fn.] 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' Cantwell v. Connecticut, 310 US 296, 309-310 [84 L.Ed. 1213, 1221, 60 S.Ct. 900, 128 A.L.R. 1352]. " (*Id.* at at pp. 571-572 [86 L.Ed. at p. 1035], fns. omitted; see also *R.A.V.* v. *City of St. Paul, Minnesota* (1992) 505 U.S. __ [120 L.Ed.2d 305, 112 S.Ct. 2538].)

" 'The word "offensive" is not to be defined in terms of what a particular addressee thinks. . . . The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight. . . . The English language has a number of words and expressions

which by general consent are "fighting words" when said without a disarming smile. . . . Such words, as ordinary men know, are likely to cause a fight. So are threatening, profane or obscene revilings. Derisive and annoying words can be taken as coming within the purview of the statute as heretofore interpreted only when they have this characteristic of plainly tending to excite the addressee to a breach of the peace. . . . The statute, as construed, does no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee, words whose speaking constitute a breach of the peace by the speaker—including "classical fighting words," words in current use less "classical" but equally likely to cause violence, and other disorderly words, including profanity, obscenity and threats.' " (*Chaplinsky* v. *State of New Hampshire, supra*, 315 U.S. at p. 573 [86 L.Ed. at p. 1036].)

Several appellate courts have indicated that the word "nigger" has the potential to be a "fighting word." (See e.g., *State of Oregon* v. *Harrington* (1984) 67 Or.App. 608 [680 P.2d 666]; *Downs* v. *State of Maryland* (1976) 30 Md.App. 253 [351 A.2d 166]; *State of New Jersey* v. *Finance American Corp.* (1981) 182 N.J.Super 33 [440 A.2d 28].)

 We should not sanction a "fighting word" as appellant's official surname. It matters not that appellant's motives may be rooted in a sincere and honest attempt to remove the sting from the word "nigger" or that it may only be uttered in the context of a name. It is the reaction thereto that may cause a breach of the peace. We opine that men and women " '. . . of common intelligence would understand . . . [the word, "nigger"] likely to cause an average addressee to fight. . . .' " (*Chaplinsky* v. *State of New Hampshire, supra*, 315 U.S. at p. 573 [86 L.Ed. at p. 1036].) "Most people today know that certain words are offensive and only calculated to wound. [Fn.] No other use remains for such words as 'nigger,' 'wop,' 'spick,' or 'kike.' " (Delgado, *supra*, 17 Harvard Civil Rights-Civil Liberties L.Rev. at p. 145.) Needless to say, there is a strong public policy in the State of California to prevent the utterance of "fighting words" which tend to incite an immediate breach of the peace.

While appellant would not address another person as a "nigger," simple use of the word, as appellant concedes, has the potential for violence. In fact, if a man asks appellant his name and he answers "Mister Nigger," the man might think appellant was calling him "Mister Nigger." Moreover, third persons, including children hearing the epithet, may be embarrassed, shocked or offended by simply hearing the word. This example illustrates how use of the name may be "confusing" (see *In re Ritchie, supra*, 159 Cal.App.3d at p. 1072) with the potential for violence.

Since appellant's common law right to use the surname has not been abrogated (§ 1279.5), none of his First Amendment rights have been prejudiced. We cannot say, as a matter of law, that the trial court abused its discretion by denying court approval of a surname that will shock, disparage, or emotionally harm members of a racial group. ■ The order only precludes the filing of the name with the Secretary of State. (§ 1279.) Nothing more, nothing less. "[Appellant] is still free to call himself what he will." (*In re Ritchie, supra,* 159 Cal.App.3d at p. 1074.)

Stone (S. J.), P. J., and Gilbert, J., concurred.