Filed 4/9/15  In re O.H. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re O.H., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO HEALTH AND HUMAN SERVICES AGENCY, | D066830 |
| Plaintiff and Respondent, | (Super. Ct. No. J514896D) |
| v. | |
| EMMETT W. et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant Emmett W.

Suzanne Davison, under appointment by the Court of Appeal, for Defendant and Appellant Kellie B.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

This is an appeal following the juvenile court's order terminating the parental rights of Kellie B., O.H.'s mother, and Emmett W., O.H.'s biological father. Kellie contends that the trial court erred in concluding that the beneficial relationship exception to adoption did not apply here.[1] Emmett contends that the trial court erred in denying his petition under Welfare & Institutions Code section 388 seeking reversal of the order terminating the reunification period so that he could be provided with reunification services, or alternatively have O.H. placed with him.[2] We conclude that appellants' contentions are without merit, and we accordingly affirm the order terminating parental rights.

I

FACTUAL AND PROCEDURAL BACKGROUND

In June 2013, shortly after O.H.'s premature birth, the San Diego County Health and Human Services Agency (the Agency) filed a petition under section 300 alleging that O.H. and Kellie both tested positive for methamphetamine or amphetamine at the time of O.H.'s birth and that Kellie tested positive for drugs during prenatal visits and admitted to

---

[1] We refer to the parties by their first names to preserve confidentiality, and we intend no disrespect in doing so.

[2] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

using alcohol while pregnant. O.H was in the neonatal unit at the hospital, and the Agency recommended that he be detained in a foster home when released. Kellie reported that O.H., Sr., was O.H.'s father. At the June 21, 2013 detention hearing, the juvenile court ordered that O.H. be detained in out-of-home care.

A paternity test showed that O.H., Sr., was not the biological father, and on August 8, 2013, the juvenile court struck O.H., Sr., from the petition and entered a judgment of nonpaternity. Kellie identified " 'Jay' " to the juvenile court as the possible biological father of O.H.

At the September 4, 2013 disposition hearing, the juvenile court declared O.H. to be a dependent of the court and ordered that he be placed in the home of a nonrelative extended family member, where he had resided since August 29, 2013. The Agency was ordered to provide reunification services to Kellie. On February 24, 2014, O.H.'s caregivers were granted de facto parent status.[3]

At the six-month review hearing on March 28, the juvenile court terminated reunification services for Kellie, finding that she had not made substantive progress with her case plan, and set a date for a permanency planning hearing. As the Agency's report stated, Kellie delayed in entering a substance abuse program, and once enrolled had not been successful because she suffered several relapses. However, Kellie did engage in regular and positive visitation with O.H.

---

[3]     All further year references are to calendar year 2014 unless otherwise indicated.

On June 16, Emmett contacted the Agency and stated that based on a recent conversation with Kellie, he might be O.H.'s biological father. Emmett told the Agency that if he was determined to be the father, he wanted to do what was required to have O.H. placed with him. Emmett explained that he was planning to enter an alcohol treatment program because of a recent arrest for driving under the influence, and that he had a criminal history of possession and being under the influence of cocaine, but claimed to have last used cocaine in 2010.

The juvenile court held a special hearing on June 30 to address Emmett's paternity and ordered DNA testing. Because Emmett was in a residential rehabilitation program at the Salvation Army that he could not physically leave for 30 days, Emmett requested that the paternity test be put off for 30 days. The juvenile court accordingly ordered that paternity testing take place on July 31. At a later hearing, the date of the permanency planning hearing was continued to allow paternity testing to be completed.

Paternity testing was conducted on August 8,[4] and test results were received by Agency on August 29, showing that Emmett is O.H.'s biological father.

On September 17, the juvenile court held a special hearing at which it found that Emmett was O.H.'s biological father. At the special hearing, Emmett filed a section 388 petition requesting that O.H. be placed with him or that reunification services be provided to him so that he could obtain custody of O.H. The juvenile court found that Emmett had

_____

[4] Through no fault of Emmett, the testing was delayed until August 8 because of problems at the testing laboratory.

4

made a prima facie showing on the necessary elements for his section 388 petition, and it set the petition for hearing on the same date as the permanency planning hearing.

At the October 16 permanency planning hearing, the juvenile court took testimony on Emmett's section 388 petition and considered the Agency's reports. Emmett testified that he only recently discovered that O.H. was his son. Although he noticed that Kellie was pregnant after they had sexual relations one time, Kellie said the baby was not his. Emmett testified that he had raised his three adult children, and he wanted O.H. to come live with him. According to Emmett, he recently had entered the Salvation Army substance abuse treatment program because he had a problem with drugs and alcohol. He had been drinking every day and his girlfriend thought the drinking was a problem. Emmett testified that he left the Salvation Army program because it was interfering with being able to visit with O.H. According to Emmett, he "sabotaged so they would kick me out," but he was attending 12-step program meetings regularly, had a sponsor, and had been sober for 132 days.

According to the Agency reports considered by the juvenile court in connection with the section 388 petition, since being recognized by the court as O.H.'s biological father on September 17, Emmett had visited with O.H. on September 18, September 25, and October 10, and all of the visits reflected positive and appropriate interactions between O.H. and Emmett. Emmett also made several telephone calls to the caregivers to check on O.H. A letter from the Salvation Army confirms that Emmett entered a six- to 12-month treatment program on June 30, but was discharged for noncompliance on September 12. Although Emmett had planned to enroll in outpatient substance abuse

5

treatment after leaving the Salvation Army, he did not attend the intake appointment. The Agency provided information that Emmett recently started working again and was living in a two-bedroom apartment belonging to his girlfriend.

The Agency conceded at the section 388 hearing that Emmett's recent confirmation as O.H.'s biological father constituted changed circumstances for the purpose of the section 388 petition. However, the Agency argued that it would not be in O.H.'s best interests to grant the section 388 petition. The Agency pointed out that O.H. had lived with his current caregivers for 14 months of his 16 months of life, and that those caregivers wanted to adopt O.H. Counsel for O.H. concurred with the Agency's view that granting the section 388 petition would not be in O.H.'s best interests.

The juvenile court denied the section 388 petition, explaining that Emmett did not meet his burden of proof to establish that it would be in the best interests of O.H. to place him with Emmett or to provide Emmett with reunification services. The juvenile court explained that O.H. was bonded to his caregivers and had become part of their family. Further, it was uncertain whether Emmett would be able to care for O.H. and satisfactorily complete any substance abuse treatment that would be required as part of the reunification services.

The juvenile court then terminated the parental rights of both Emmett and Kellie, ordering that O.H. be placed for adoption. The juvenile court specifically found that O.H. was likely to be adopted if parental rights were terminated, and it rejected Kellie's argument that the beneficial relationship exception to adoption applied.

Both Emmett and Kellie filed notices of appeal.

6

## II

## DISCUSSION

A.    *The Trial Court Did Not Err in Denying Emmett's Section 388 Petition*

We first consider Emmett's contention that the trial court erred in denying his section 388 petition requesting that O.H. be placed with him or that he receive reunification services.

Under section 388, "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made . . . ."  (§ 388, subd. (a)(1).)  "If the petition filed under section 388[, subdivision ](a) . . . states a change of circumstance or new evidence and it appears that the best interest of the child . . . may be promoted by the proposed change of order or termination of jurisdiction, the court may grant the petition." (Cal. Rules of Court, rule 5.570(e)(1); see *In re Amber M.* (2002) 103 Cal.App.4th 681, 685.)  "The petitioning party has the burden of showing, by a preponderance of the evidence, that there is a change of circumstances or new evidence, *and* the proposed modification is in the child's best interest."  (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.)

"The determination of whether to change an existing order is 'committed to the sound discretion of the juvenile court, and [its] ruling should not be disturbed on appeal unless an abuse of discretion is clearly established.' "  (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.)

"While a biological father is not entitled to custody under section 361.2, or reunification services under section 361.5 if he does not attain presumed father status prior to the termination of any reunification period, he may move under section 388 for a hearing to reconsider the juvenile court's earlier rulings based on new evidence or changed circumstances." (*In re Zacharia D.* (1993) 6 Cal.4th 435, 454, fn. omitted.) As Emmett's section 388 petition came very late in the juvenile dependency process, after the reunification period had ended and the permanency planning hearing was scheduled, the juvenile court was required to focus on whether it would promote O.H.'s need for stability and permanency if the section 388 petition were granted. Only "up until the time the section 366.26 [permanency planning] hearing is set, [is] the parent's interest in reunification . . . given precedence over the child's need for stability and permanency." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability . . . .' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) "[T]he interests of the parent and the child have diverged by the point of a [section 366].26 hearing to select and implement a child's permanent plan." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

Here, the trial court was within its discretion to conclude that Emmett had not met his burden to establish that it would be in O.H.'s best interests to remove him from his caregivers, with whom he had been placed when he was two months old and had developed a strong bond, or, in the alternative, to delay permanency with the goal of

8

possibility removing O.H. from his caregivers in the future and placing him with Emmett. The juvenile court reasonably could conclude that taking O.H. from the only home that he had known since he was two months old, would upset his need for stability and security. (See *In re J.C.*, *supra*, 226 Cal.App.4th at p. 528 ["[T]here was ample evidence [O.H.] would be devastated and suffer great detriment if [he] were removed from [his caregiver's] home after two and one-half years. It is the only loving, safe, and stable home [he] has ever known."].) Further, the juvenile court reasonably could conclude that the prospect of an additional reunification period during which Emmett would receive services to establish that he could care for O.H., "would not have promoted stability for [O.H.] and thus would not have promoted [his] best interests." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 594.) As the juvenile court observed, based on Emmett's history of substance abuse and his recent failure for noncompliance at the Salvation Army treatment program, there was no guarantee that Emmett would be able to successfully complete the substance abuse component of reunification services. Based on this uncertainty, the goal of providing O.H. with stability would not be served by delaying permanency to allow Emmett to try to complete reunification services.[5]

Emmett argues that in determining whether the juvenile court erred in granting his section 388 petition, we should look to the factors set forth in *Kimberly F.* (1997) 56

---

[5] Although we are sympathetic to Emmett's situation and commend him for immediately taking steps to become part of O.H.'s life as soon as he discovered he was the biological father, the abuse of discretion standard of review and the required focus on the best interests of O.H. lead us to conclude that the juvenile court did not err in denying the section 388 petition.

Cal.App.4th 519, 531-532 (*Kimberly F.*). As set forth in *Kimberly F.*, factors that a court may consider in determining whether to grant a section 388 petition include: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been."

(*Kimberly F.*, at p. 532.)[6] *Kimberly F.* dealt with the more common situation in which a parent who has failed in successfully completing reunification services files a section 388 petition to delay permanency and obtain additional reunification services. (*Id.* at p. 525.) Here, because Emmett did not have O.H. removed from his care, two of the three *Kimberly F.* factors are not pertinent: the seriousness of the parent's problems that led to the dependency and whether they can be or have been ameliorated.[7] However, the

---

[6]    As the Agency points out, some case law has declined to apply the *Kimberly F.* factors because they do not sufficiently take into account the Supreme Court's statement in *Stephanie M.*, *supra*, 7 Cal.4th at page 317, that after termination of reunification services, the focus must be on the child's need for permanency and stability. (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 527.) We need not address the extent to which the *Kimberly F.* factors are appropriate in light of *Stephanie M.*, as we conclude that even applying those factors, the trial court did not abuse its discretion in denying Emmett's section 388 petition.

[7]    We note, however, that substance abuse problems were the reason for O.H.'s removal from Kellie's care, and the juvenile court observed that the Agency would also likely have required that Emmett deal with his substance abuse problems before recommending that O.H. be placed with Emmett. Because he failed to complete the Salvation Army treatment program and did not enroll in an outpatient program, Emmett had not yet demonstrated that the substance abuse problems could be "removed or ameliorated." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.)

remaining *Kimberly F.* factor, namely, the nature of the bond that O.H. has with Emmett compared to his bond with his caregivers, is directly on point and strongly supports the juvenile court's decision. Because O.H. only had a few visits with Emmett by the time of the section 388 hearing, he did not have a parental bond with Emmett.

In sum, we conclude that the juvenile court did not abuse its discretion in determining that it was in O.H.'s best interests to deny Emmett's section 388 petition.

B.   *The Juvenile Court Did Not Err in Concluding That Kellie Did Not Meet Her Burden to Establish the Beneficial Relationship Exception to Adoption*

We next consider Kellie's argument that the trial court erred in concluding that she did not establish that the beneficial relationship exception to adoption applied here.

At a permanency planning hearing, once the juvenile court finds by clear and convincing evidence that the child is likely to be adopted within a reasonable time, the court is *required* to terminate parental rights and select adoption as the permanent plan, unless the parent shows that termination of parental rights would be detrimental to the child under one of several statutory exceptions. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) One of these statutory exceptions is the beneficial relationship exception to adoption, which applies when it would be detrimental to the child to terminate parental rights in that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The burden is on the party seeking to establish the beneficial relationship exception to produce evidence establishing the exception is applicable. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) Once the

11

juvenile court finds that a parent has met his or her burden to establish that the requirements of the beneficial relationship exception are present, the juvenile court may chose a permanent plan other than adoption if it finds the beneficial relationship to be "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); see *Bailey J.*, at p. 1315.)

We apply a substantial evidence standard of review to a juvenile court's findings on whether the requirements for the beneficial relationship exception have been established. (*Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)[8]

There is no dispute that Kellie engaged in regular and consistent visitation with O.H., which is the first requirement for the application of the beneficial relationship exception. The disputed issue here is whether Kellie met her burden to establish the second requirement, namely, that she had a relationship with O.H. that he would benefit from continuing.

---

[8] There is some debate in recent case law on the proper standard of review regarding the beneficial relationship exception. In *In re J.C.*, *supra*, 226 Cal.App.4th 503, the court applied the substantial evidence standard of review to the factual issues of whether the parent maintained regular visitation and contact with the child and whether the parent proved he or she had a beneficial parental relationship with the child. However, as to the weighing test, in which the juvenile court balances the parent-child relationship against the benefits the child would derive from adoption to decide whether the relationship is a compelling reason to chose a permanent plan other than adoption, the abuse of discretion test applied to "[t]his ' " . . . quintessentially" discretionary decision.' " (*Id.* at p. 531; see *Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) We need not take a position on that issue, as the juvenile court here did not find a beneficial parental relationship and thus did not proceed to weighing whether that relationship was a compelling reason to chose a permanent plan other than adoption.

The statutory phrase "benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i)) refers to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

To meet the burden of proof to establish a beneficial relationship, "the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits — the parent must show that he or she occupies a parental role in the life of the child." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527; see *In re Jason J.* (2009) 175 Cal.App.4th 922, 936-937 (*Jason J.*); *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 (*Derek W.*).) The evidence must establish more than merely "a loving and happy relationship" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419), and the parent must be more than " 'a friendly visitor.' " (*Jason J.*, at p. 938.) "A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) "It is only in an extraordinary case that preservation of the

13

parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Here, although Kellie had a positive and pleasant relationship with O.H., she did not have a close parental relationship with him. O.H. never lived together with Kellie. Instead, throughout his entire life O.H. had looked to someone else as his primary caregiver, and he was strongly bonded to his current caregivers, who planned to adopt him. In the Agency's July 8 report for the permanency planning hearing, the social worker described Kellie's interaction with O.H. during visits as caring, attentive and loving, and observed that O.H. was familiar and comfortable with Kellie, but concluded that "the relationship appears to be one that resembles more of a friendly visitor relationship rather than a parent[-]child relationship." The Agency's reports and visitation logs showed that Kellie had positive and appropriate visits with O.H., but that O.H. separated easily at the end of the visits and went enthusiastically to his caregiver.

Based on this evidence, the juvenile court reasonably could find that Kellie did not establish that she "occupies a parental role in the life of the child" (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1527), and that Kellie's relationship to O.H. "bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) The beneficial relationship exception does not apply, as "[t]here is no evidence [O.H.] had any needs only [Kellie] can satisfy, or that he has the type of emotional attachment to [Kellie] that would cause [O.H.] to be greatly harmed if parental rights were terminated." (*Jason J.*, *supra*, 175 Cal.App.4th at p. 938.)

14

We accordingly conclude that there is no merit to Kellie's challenge to the juvenile court's determination that Kellie did not establish that the beneficial relationship to adoption applies here.

## DISPOSITION

The order terminating parental rights is affirmed.


IRION, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.