******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DEVLIN, J., concurring in part and dissenting in part. I agree with the majority that the evidence was sufficient to support the trial court's verdict of guilty on the charge of tampering with a witness in violation of General Statutes § 53a-151. I write separately because I also believe that the evidence was sufficient to support the guilty verdict on the charge of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (5). Contrary to the majority, I do not believe that *State* v. *Baccala*, 326 Conn. 232, 163 A.3d 1, cert. denied,    U.S.    , 138 S. Ct. 510, 199 L. Ed. 2d 408 (2017) requires a different result.

As related to the breach of the peace charge, the trial court reasonably could have found the following facts. On August 28, 2014, between 9 a.m. and 9:30 a.m., New Canaan Parking Enforcement Officer Michael McCargo was patrolling a municipal parking lot in the town's commercial district. Although there were a few parking spaces that permitted up to fifteen minutes of free parking, the majority of parking spaces required that the motorist pay a fee to park. McCargo observed the defendant's car in space number two, which required payment of a parking fee that had not been paid by the defendant. Accordingly, McCargo stopped his parking enforcement vehicle in the parking lot's travel lane near the defendant's car and issued a parking ticket. McCargo noted a second unpaid vehicle parked in a space near the center of the parking lot. He left his vehicle, still parked near the defendant's car, and walked to the car at the center of the lot. McCargo was in the process of issuing a ticket for the second vehicle when the driver of that vehicle showed up. The driver said that she did not know that she had to pay to park there. The driver just left it at that.

McCargo then walked back to his parking enforcement vehicle. The defendant approached him stating: "[N]ot only did you give me a ticket, but you blocked me in." McCargo responded jokingly: "[T]hat's because I didn't want you to get away." The defendant explained why he was parked in the lot and McCargo stated why he had issued the ticket. McCargo noted the free fifteen minute parking spaces nearby. Unhappy with the explanation, the defendant said that the New Canaan Parking Department was "unfucking believable." As the defendant said this, his demeanor changed as he emphasized the profanities. At one point, McCargo advised the defendant to watch what he said, to which the defendant responded: "It's freedom of speech."

The encounter then escalated and the defendant said: "I know why you gave me a ticket. . . . [Y]ou gave me a ticket because my car is white." McCargo looked at the defendant. The defendant continued: "[N]o, you're

giving me a ticket because I'm white."[1] The defendant then turned and walked back to his parked vehicle. As he walked, the defendant said "remember Ferguson."

McCargo understood "Ferguson" to reference the then recent incident in Ferguson, Missouri in which a police officer had shot a black male. McCargo believed the events in Ferguson had been quite recent—within a few days of the encounter with the defendant. McCargo considered the defendant's comment to be a threat and believed that the defendant was implying that what happened at Ferguson was going to happen to him. He felt that the defendant was trying to "rile [him] up" and "just take it to a whole other level."

Mallory Frangione, who was in the parking lot, witnessed the confrontation between the defendant and McCargo. She saw the defendant yelling and motioning with his hands back and forth and up and down in an aggressive manner and taking steps toward McCargo. She also overheard the defendant reference Ferguson and say "f'ing unbelievable." Even though she was approximately seventy feet away, witnessing the incident made her feel nervous and upset.

After the "Ferguson" comment, the defendant and McCargo returned to their respective vehicles. As they were getting inside their vehicles, McCargo testified that he heard the defendant say "fucking niggers." McCargo pulled away and the defendant backed out of his space and drove behind McCargo. The defendant drove his vehicle around McCargo's vehicle and, as he passed, he looked at McCargo and again said: "[F]ucking niggers." This was said louder than the first time. While saying this, the defendant had an angry expression on his face and spoke in a loud and angry tone.

McCargo was shocked and appalled by the remarks. When McCargo advised his supervisor of the incident, he was clearly upset. His supervisor encouraged him to make a report to the New Canaan Police Department, and he did so.

In considering the defendant's challenge to his conviction for breach of the peace in the second degree, we apply a two-part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Cook*, 287 Conn. 237, 254, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). More specifically, as to the present case, to establish the defendant's violation of § 53a-181 (a) (5), the state was required to prove beyond a reasonable doubt that the defendant's words were "fighting words" that were likely to "induce immediate

violence by the person or persons to whom [they were] uttered because of their raw effect." *State* v. *Caracoglia*, 78 Conn. App. 98, 110, 826 A.2d 192, cert. denied, 266 Conn. 903, 832 A.2d 65 (2003).

"In cases where [the line between speech unconditionally guaranteed and speech which may be legitimately regulated] must be drawn, the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see if they are consistent with the first amendment. . . . We undertake an independent examination of the record as a whole to ensure that the judgment does not constitute a forbidden intrusion on the field of free expression." (Citations omitted; internal quotation marks omitted.) *State* v. *Baccala*, supra, 326 Conn. 251.

The majority is correct that, in announcing its verdict, the trial court conflated the physically aggressive aspects of the encounter with the racial epithets that came later. The record is clear that the two aspects of the incident were separate. Notwithstanding the trial court's remarks, in my view, the evidence supports the defendant's conviction of breach of the peace in the second degree.

The first amendment constitutional right to freedom of speech, while generally prohibiting the government from proscribing speech based on disapproval of its content, does not protect "fighting words" that tend to incite a breach of the peace. (Internal quotation marks omitted.) *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 571–72, 62 S. Ct. 766, 86 L. Ed. 1031 (1942). "[F]ighting words" are "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." (Internal quotation marks omitted.) *Cohen* v. *California*, 403 U.S. 15, 20, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971).

In *State* v. *Baccala*, supra, 326 Conn. 232, our Supreme Court considered whether the angry outbursts of a dissatisfied customer directed at a manager of a supermarket were sufficient to support her conviction for breach of the peace in the second degree. This was no ordinary dispute. The defendant became very angry when she became aware that she would not be able to pick up a Western Union money transfer. Id., 235–36. The defendant, in a loud voice, called the store manager a "fat ugly bitch" and a "cunt" and said "fuck you, you're not a manager" all the while gesticulating with a cane. (Internal quotation marks omitted.) Id., 236.

In concluding that the defendant's words were protected by the first amendment, our Supreme Court noted several concepts pertinent to the fighting words exception. First, the court noted that there are no per se fighting words but, rather, words may or may not be fighting words depending upon the circumstances

of their use. Id., 238–39. Second, "[a] proper contextual analysis requires consideration of the actual circumstances as perceived by a reasonable speaker and addressee to determine whether there was a likelihood of violent retaliation. . . . A proper examination of context also considers those personal attributes of the speaker and the addressee that are reasonably apparent because they are necessarily a part of the objective situation in which the speech was made." (Citations omitted.) Id., 240–41. Finally, the court's task is to "determine on a case-by-case basis all of the circumstances relevant to whether a reasonable person in the position of the actual addressee would have been likely to respond with violence." Id., 245. It is the "tendency or likelihood of the words to provoke violent reaction that is the touchstone of the *Chaplinsky* test . . . ." (Internal quotation marks omitted.) Id., 247.

Given the *Baccala* decision, one may fairly pose the following question: If angrily calling a store manager a "fat ugly bitch" and a "cunt" is not breach of the peace, how can the words used in the present case be considered fighting words that would support a conviction for breach of the peace? This is essentially the position of the majority. The majority rests its reversal of the breach of the peace in the second degree conviction on two grounds. First, that, under the circumstances in which the defendant used the language, it was not likely to provoke a reasonable person in McCargo's position to immediately retaliate with violence. Second, that a parking official should expect frustration from persons who receive parking tickets and therefore not be likely to retaliate with immediate violence.

As to the second ground, there is nothing in the record to support the assertion that a "parking official" is less likely to respond to a provocative racial insult than any other person. In McCargo's experience, there were people who were not happy about receiving a parking ticket. He testified, however, that no one had ever used the level of language employed by the defendant.

Turning to the first ground, that the language was not likely to provoke a reasonable person to retaliate with violence, I believe that this does not account for the truly inflammatory and provocative language used. The word "nigger" is commonly used and understood as an offensive and inflammatory racial slur. See Merriam-Webster's Collegiate Dictionary (11th Ed. 2011) One commentator describes its effect this way: "American society remains deeply afflicted by racism. Long before slavery became the mainstay of the plantation society of the antebellum South, Anglo-Saxon attitudes of racial superiority left their stamp on the developing culture of colonial America. Today, over a century after the abolition of slavery, many citizens suffer from discriminatory attitudes and practices, infecting our economic system, our cultural and political institutions, and the

daily interactions of individuals. The idea that color is a badge of inferiority and a justification for the denial of opportunity and equal treatment is deeply ingrained. *The racial insult remains one of the most pervasive channels through which discriminatory attitudes are imparted.* Such language injures the dignity and self-regard of the person to whom it is addressed, communicating the message that distinctions of race are distinctions of merit, dignity, status, and personhood. Not only does the listener learn and internalize the messages contained in racial insults, these messages color our society's institutions and are transmitted to succeeding generations." (Emphasis added; footnotes omitted.) R. Delgado, "Words that Wound: A Tort Action for Racial Insults, Epithets, and Name-Calling," 17 Harv. Civil Rights-Civil Liberties L. Rev. 133, 135–136 (1982).

In *Baccala*, the court recognized the particularly heinous nature of racial epithets in citing to *In re Spivey*, 345 N.C. 404, 480 S.E.2d 693 (1997) and *In re John M.*, 201 Ariz. 424, 36 P.3d 772 (App. 2001). *State* v. *Baccala*, supra, 326 Conn. 242–43. *In re Spivey*, supra, 408, concerned a removal proceeding for a district attorney who repeatedly called a black bar patron "nigger." In denying the respondent's claim that his use of the word was protected by the first amendment, the Supreme Court of North Carolina took judicial notice of the following: "No fact is more generally known than that a white man who calls a black man 'a nigger' within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate." Id., 414. The court went on to describe the respondent's repeated references to the bar patron as a "nigger" as a "classic case of the use of fighting words tending to incite an immediate breach of the peace . . . ." (Internal quotation marks omitted.) Id., 415.

In *In re John M.*, supra, 201 Ariz. 424, a juvenile leaned out a car window and yelled "fuck you, you god damn nigger" to an African-American woman walking to a bus stop. Id., 425. In concluding that these words were not protected speech, the Court of Appeals of Arizona observed: "We agree with the [s]tate that few words convey such an inflammatory message of racial hatred and bigotry as the term nigger. According to Webster's New World Dictionary, the term is generally regarded as virtually taboo because of the legacy of racial hatred that underlies the history of its use among whites, and its continuing use among a minority as a viciously hostile epithet." (Internal quotation marks omitted.) Id., 428.

*In re Spivey* and *In re John M.* are by no means the only cases that have categorized the word "nigger" as a fighting word. See, e.g., *In re H.K.*, 778 N.W.2d 764, 767, 770 (N.D. 2010) (following a teenage girl of African-American ancestry into a bathroom during a dance, yelling at her and calling her a "nigger" and then "telling

[her she doesn't] own this town, that they own this town, and they don't want niggers in their town and that [she needed] to watch out" were fighting words likely to incite a breach of the peace); *Lee* v. *Superior Court*, 9 Cal. App. 4th 510, 518, 11 Cal. Rptr. 2d 763 (1992) (denying request of African-American applicant to legally change his name to "Misteri Nigger" and stating: "We opine that men and women . . . of common intelligence would understand . . . [the word, nigger] likely to cause an average addressee to fight" [internal quotation marks omitted]).

The present case falls within the "fighting words" exception to first amendment protection for several reasons. First, the words used by the defendant were personally provocative. This was not a situation like *Cohen* v. *California*, supra, 403 U.S. 20, in which the defendant's jacket bore the words "Fuck the Draft" directed at no one in particular. (Internal quotation marks omitted.) Here, the defendant was directing personally provocative insults at McCargo. Second, the racial animus expressed by the defendant was not restricted to the "fucking niggers" comments. The encounter between the defendant and McCargo almost immediately took on a racial tone when the defendant commented: "You're giving me a ticket because I'm white." The defendant's inflammatory reference to the highly controversial shooting of an African-American man by a white police officer—"remember Ferguson"— only raised the tension more. Third, a witness approximately seventy feet away saw the defendant motion with his hands back and forth, up and down in an aggressive manner. Although she could not hear everything, she heard the defendant reference Ferguson and say "f'ing unbelievable." She could tell that the defendant was yelling and it upset her. Finally, the defendant angrily and twice hurled the worst racial epithet in the English language at McCargo with the "fucking niggers" comment.[2]

These were scathing insults that in many situations would provoke a reflexive visceral response. The fact that no such response occurred is not dispositive of whether words are fighting words. See *State* v. *Hoshijo ex rel. White*, 102 Haw. 307, 322, 76 P.3d 550 (2003) (fact that violence was not precipitated is of no consequence, as "proper standard is whether the words were *likely to provoke a violent response*, not whether violence occurred" [emphasis in original]). Also, the fact that the defendant was in his car at the moment that he yelled his "fucking niggers" epithets does not eviscerate their "fighting words" quality. Other cases have upheld breach of the peace convictions on similar facts. See *In re John M.*, supra, 201 Ariz. 428–29 (the words "fuck you, you god damn nigger" yelled at an African-American woman from a car as it pulled away were unprotected fighting words). Moreover, the cumulative effect of the entire incident constituted a breach of the peace.

I recognize that there are those who advocate that no speech, however vile and provocative, should be subject to criminal sanction. See Note, "The Demise of the *Chaplinsky* Fighting Words Doctrine: An Argument for its Internment," 106 Harv. L. Rev. 1129, 1140 (1993) (recommending that *Chaplinsky* be overruled because "it is a hopeless anachronism that mimics the macho code of barroom brawls" [internal quotation marks omitted]); see also *State* v. *Tracy*, 200 Vt. 216, 237, 130 A.3d 196 (2015) ("[i]n this day and age, the notion that *any* set of words are so provocative that they can reasonably be expected to lead an average listener to immediately respond with physical violence is highly problematic" [emphasis in original]).

Steven Pinker, a psychology professor at Harvard University, reflected on this change in attitude and behavior when he wrote: "Centuries ago our ancestors may have had to squelch all signs of spontaneity and individuality in order to civilize themselves, but now that norms of nonviolence are entrenched, we can let up on particular inhibitions that may be obsolete. In this way of thinking, the fact that . . . men curse in public is not a sign of cultural decay. On the contrary, it's a sign that they live in a society that is so civilized that they don't have to fear being harassed or assaulted in response. As the novelist Robert Howard put it, '[c]ivilized men are more discourteous than savages because they know they can be impolite without having their skulls split.' " S. Pinker, The Better Angels of Our Nature (Penguin Books 2011) p. 128.

In *Baccala*, our Supreme Court left for another day "the continued vitality of the fighting words exception . . . ." *State* v. *Baccala*, supra, 326 Conn. 240. In my view, if angrily calling an African-American man a "fucking [nigger]" after taunting him with references to a recent police shooting of a young African-American man by a white police officer is not breach of the peace, then that day has come.

Because I believe that the evidence was sufficient to support the defendant's conviction of breach of the peace in the second degree, I would affirm the judgment of the trial court on that count.

[1] The defendant is a white male and McCargo is an African-American male.

[2] "The experience of being called 'nigger' . . . is like receiving a slap in the face. The injury is instantaneous." (Internal quotation marks omitted.) *Taylor* v. *Metzger*, 152 N.J. 490, 503, 706 A.2d 685 (1998).